WISCONSIN MEDICAL SOCIETY, INC. and
David M. Hoffmann, M.D.,
Plaintiffs-Appellants,

v.

Michael L. MORGAN, Defendant-Respondent.

Supreme Court

*No. 2009AP728. Oral argument April 15, 2010.*
*—Decided July 20, 2010.*

2010 WI 94

(Also reported in 787 N.W.2d 22.)

For the plaintiffs-appellants there were briefs (in the court of appeals) and a brief in the supreme court by *Cynthia L. Buchko, Thomas M. Pyper,* and *Whyte Hirschboeck Dudek, S.C.,* Madison, and oral argument by *Thomas M. Pyper.*

For the defendant-respondent the cause was argued by *Charlotte Gibson,* assistant attorney general, and *Christopher J. Blythe,* assistant attorney general was on the brief (in the court of appeals) and a brief in the supreme court, with whom on the briefs was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Peter L. Gardon, Jessica Hutson Polakowski,* and *Reinhart Boerner Van Deuren S.C.,* Madison, on behalf of the Wisconsin Academy of Family Physicians, the American Academy of Family Physicians, the Wisconsin Chapter of the American College of Physicians, the Milwaukee District Association of Osteopathic Physicians and Surgeons, and the American Medical Association.

An amicus curiae brief was filed by *Anne Berleman Kearney* and *Appellate Consulting Group,* Milwaukee, on behalf of the Wisconsin Hospital Association.

An amicus curiae brief was filed by *William L. Shenkenberg, Michael Marx, Sean Lanphier*, and *Mallory & Zimmerman, S.C.*, Milwaukee, on behalf of the Medical College of Wisconsin.

An amicus curiae brief was filed by *Michael B. Van Sicklen, Bree Grossi Wilde*, and *Foley & Lardner LLP,* Madison, on behalf of Dean Health Systems, Inc., Marshfield Clinic and Gunderson Lutheran Health System, Inc.

An amicus curiae brief was filed by *Lester A. Pines* and *Cullen, Weston, Pines & Bach LLP,* Madison, on behalf of the Advocates for Medicaid Patients.

An amicus curiae brief was filed by *Lynn R. Laufenberg* and *the Laufenberg Law Group, S.C.*, Milwaukee and by *Dana J. Weis* and *Habush, Habush & Rottier, S.C.*, Rhinelander, on behalf of the Wisconsin Association for Justice, and oral argument by *Dana J. Weis*.

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification from the court of appeals pursuant to Wis. Stat. § (Rule) 809.61 (2007–08).[1] As part of the 2007–2009 state budget, 2007 Wis. Act 20 (the Act), the legislature transferred $200 million from the Injured Patients and Families Compensation Fund (the Fund) to the Medical Assistance Trust Fund (MATF). 2007 Wis. Act 20, § 9225. To implement the Act, the Department of Administration, under the supervision and direction of Secretary Michael L. Morgan (Secretary Morgan), subsequently made two transfers of $71.5 million and $128.5 million from the Fund.

¶ 2. The Wisconsin Medical Society (the Medical Society) and Dr. David Hoffmann, M.D. (Dr. Hoffmann)

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

brought this suit, claiming that Secretary Morgan took private property without just compensation. The circuit court dismissed the suit on grounds that the Medical Society lacked a property interest in the Fund.

¶ 3. The Medical Society appealed, and the court of appeals certified the matter to this court. We granted certification on the following two questions:

> (1) Do the plaintiffs have a protectable property interest in the Injured Patients and Families Compensation Fund?
>
> (2) Is a statute that retroactively repudiates a government's contractual obligation constitutional?

¶ 4. We conclude that the health care providers have a constitutionally protected property interest in the Fund. Wisconsin Stat. § 655.27(6) defines the Fund as an irrevocable trust, and the structure and purpose of the Fund satisfy all the elements necessary to establish a formal trust. Because the health care providers are specifically named as beneficiaries of the trust, they have equitable title to the assets of the Fund.

¶ 5. From their equitable title in the Fund, the health care providers have at least three corresponding rights. First, they have a right to the security and integrity of the entire Fund. Second, they have a right to realize the Fund's investment earnings to moderate, perhaps even lower, their assessments. Third, health care providers and the proper claimants have the right to have excess judgments paid to the proper claimants. Any transfer of money from the Fund for an improper purpose infringes upon these three rights.

¶ 6. Because health care providers have protected property interests in the Fund, we conclude that § 9225 of 2007 Wis. Act 20 is unconstitutional because it

476

authorizes an unconstitutional taking of private property without just compensation.

¶ 7. Accordingly, we reverse the circuit court's order granting summary judgment and dismissing the Medical Society's suit. We remand with directions that the circuit court issue (1) an order requiring Secretary Morgan to replace the money removed from the Fund, together with lost earnings and interest that has been charged to the Fund; and (2) a permanent injunction prohibiting Secretary Morgan from transferring money out of the Fund pursuant to § 9225 of 2007 Wis. Act 20.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 8. A full appreciation of the issues in this case requires a detailed examination of the Fund itself. Accordingly, we begin this section by examining the history of the Fund and the current statutory structure. We then examine 2007 Wis. Act 20 and the transfer of money from the Fund to the MATF. Finally, we set out the procedural history of this case.

## A. The Fund

¶ 9. The Fund was established by the legislature in 1975 in response to the rising cost of professional liability insurance coverage for health care providers, which was leading to increased health care costs and decreased availability of health care services. § 1, ch. 37, Laws of 1975. The stated purpose of the Fund is "to curb the rising costs of health care by financing part of the liability incurred by health care providers as a result of medical malpractice claims and to ensure that proper claims are satisfied." Wis. Stat. § 655.27(6).

¶ 10. The Fund operates as part of a broad legislative scheme set out in Wis. Stat. ch. 655. Chapter 655 "provide[s] the exclusive procedure for a person to

pursue a malpractice claim against a health care provider." *Rouse v. Theda Clark Med. Ctr., Inc.*, 2007 WI 87, ¶ 35, 302 Wis. 2d 358, 735 N.W.2d 30 (citing *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 499, 261 N.W.2d 434 (1978)). The provisions of ch. 655 are applicable to nearly all health care providers practicing in Wisconsin who are not state, county, or municipal employees, or federal employees.[2]

¶ 11. Under ch. 655, each health care provider is required to maintain health care liability insurance or qualify as a self-insurer. Wis. Stat. § 655.23(3)(a). As of July 1, 1997, each health care provider is required to maintain liability coverage of at least $1,000,000 for each claim or occurrence and $3,000,000 for all claims or occurrences in any one policy year. Wis. Stat. § 655.23(4)(b)2.a., b. As long as a health care provider has an insurance policy in force and complies with the requirements of ch. 655, the liability of the health care provider and his or her insurer is limited to the required amount of liability insurance or the maximum limit of the health care provider's liability insurance policy, whichever is greater. Wis. Stat. § 655.23(5).[3]

---

[2] Chapter 655 applies to physicians and nurse anesthetists whose principal place of practice is Wisconsin and who practice in Wisconsin more than 240 hours a year. Wis. Stat. § 655.002(a). Participation is also mandatory for certain physicians and nurse anesthetists living in Wisconsin but practicing in Michigan, partnerships, corporations, other organizations, cooperative sickness care associations, ambulatory surgery centers, hospitals, affiliates of hospitals, and nursing homes combined with hospitals. Wis. Stat. § 655.002(b)-(j); *see also* Wis. Stat. § 655.003 (exception for government employees).

[3] Wisconsin Stat. § 655.23(5) provides:

> While health care liability insurance, self-insurance or a cash or surety bond under sub. (3)(d) remains in force, the health care

¶ 12. Each health care provider who is subject to the provisions of ch. 655 also is required to participate in the Fund by paying an annual assessment. Wis. Stat. § 655.27(3)(a). For health care providers complying with the requirements of ch. 655, the Fund pays out that portion of any medical malpractice claim in excess of the amount of insurance that the health care provider is required to maintain, or the maximum liability of the health care provider's insurance, whichever is greater. Wis. Stat. § 655.27(1). In other words, the Fund is liable for payments "after a health care provider's statutorily mandated liability coverage limits are exceeded." *Wis. Patients Comp. Fund v. Wis. Health Care Liability Ins. Plan,* 200 Wis. 2d 599, 613, 547 N.W.2d 578 (1996) (hereinafter *WHCLIP*).

¶ 13. Wisconsin Stat. § 655.23(6) provides that a health care provider who fails to participate in the Fund is subject to the broad enforcement authority of the Commissioner of Insurance (the commissioner) under Wis. Stat. § 601.64.[4] Furthermore, a health care provider who does not participate in the Fund may not exercise any of the rights or privileges of his health care license. Wis. Stat. § 655.23(7). The board that granted the health care provider his or her license may suspend

provider, the health care provider's estate and those conducting the health care provider's business, including the health care provider's health care liability insurance carrier, are liable for no more than the limits expressed in sub. (4) or the maximum liability limit for which the health care provider is insured, whichever is higher, if the health care provider has met the requirements of this chapter.

[4] Wisconsin Stat. § 601.64 gives the commissioner the authority to commence an action in circuit court (1) to enjoin a violation of the statute or a rule; and (2) for a forfeiture up to $5,000 for each day of the violation. Wis. Stat. § 601.64(1), (2). It also subjects intentional violators to criminal penalties. Wis. Stat. § 601.64(4).

or refuse to issue or renew the license if the health care provider does not participate in the Fund. *Id.*

¶ 14. When the Fund was initially created, the legislature specified that it "shall be held in trust for the benefit of insureds and other proper claimants," and that "[t]he fund may not be used for purposes other than those of this chapter." § 10, ch. 37, Laws of 1975. In 2003 this language was expanded to specify:

> The fund is established to curb the rising costs of health care by financing part of the liability incurred by health care providers as a result of medical malpractice claims and to ensure that proper claims are satisfied. The fund, including any net worth of the fund, is *held in irrevocable trust for the sole benefit of health care providers participating in the fund and proper claimants. Moneys in the fund may not be used for any other purpose of the state.*

Wis. Stat. § 655.27(6) (emphasis added).

¶ 15. The Fund is managed by a board of governors (the board). Wis. Stat. § 655.27(2). The board also oversees the WHCLIP, a risk-sharing plan to insure health care providers unable to obtain private coverage. Wis. Stat. § 619.04(3); *WHCLIP,* 200 Wis. 2d at 607–08. The board consists of 13 members representing different industries and organizations. Wis. Stat. § 619.04(3).[5]

---

[5] The board includes 3 representatives of the insurance industry appointed by the commissioner, a person named by the State Bar of Wisconsin, a person named by the Wisconsin Association for Justice (formerly the Wisconsin Academy of Trial Lawyers), two persons named by the Wisconsin Medical Society, a person named by the Wisconsin Hospital Association, the commissioner or a designated representative, and four public members appointed by the governor for staggered 3–year terms. Wis. Stat. § 619.04(3).

¶ 16. Because the Fund is a trust held for the benefit of health care providers and claimants, the board "is endowed with the requisite authority to perform all of the functions of trustees under the common law of trusts." *WHCLIP,* 200 Wis. 2d at 615. Accordingly, it has the "power and duty" to take legal action "for the protection of the trust estate." *Id.* (quoting *Strykowski,* 81 Wis. 2d at 518).

¶ 17. The board also has statutory authority to grant approval of the annual fees that health care providers must pay into the Fund, which are set by the commissioner. Wis. Stat. § 655.27(3)(b). Wisconsin Stat. § 655.27(3)(a) mandates that the fees be set based on six factors:

> 1. Past and prospective loss and expense experience in different types of practice.

> 2. The past and prospective loss and expense experience of the fund.

> 2m. The loss and expense experience of the individual health care provider . . .

> 3. Risk factors for persons who are semiretired or part-time professionals.

> 4. For [partnerships, corporations, or other organizations or enterprises], risk factors and past and prospective loss and expense experience attributable to employees of that health care provider other than employees licensed as a physician or nurse anesthetist.

> 5. The supplemental appropriation under § 20.145(2)(a) for payment of claims.

Wis. Stat. § 655.27(3)(a).[6] The fees set for a given fiscal year may not exceed the estimated total amount of claims to be paid during that fiscal year, the fees paid in the previous fiscal year adjusted by inflation, or 200 percent of the total dollar amount disbursed for claims during the calendar year proceeding the previous fiscal year, *whichever is greatest.* Wis. Stat. § 655.27(3)(br).

¶ 18. When the Fund was established in 1975, it operated on a cash basis. This meant that the health care providers were assessed based on the actual amount paid out for claims in a given year. During the 1980s, the Fund switched to accrual accounting to improve the Fund's integrity. Under accrual accounting, the Fund's annual net balance is based on its assets minus the estimated "loss liabilities." Loss liabilities are the amounts expected to be paid in the future for incidents that occurred in a given year, even if the underlying claims have not yet been made. *See* Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 25, available at http://www.legis.state.wi.us/lab/reports/10–4full.pdf (last visited July 13, 2010) (hereinafter 2010 Audit).[7] Using the accrual method helps ensure that the Fund maintains sufficient assets to pay any of these outstanding loss liabilities if the Fund were discontinued.

¶ 19. Loss liabilities account for nearly all of the Fund's liabilities. Estimating the loss liabilities in a given

---

[6] The sixth factor was added as part of 2007 Wis. Act 20 to account for a supplemental appropriation of $100 million included in the Act.

[7] We take judicial notice of the 2010 Audit, which is an easily accessible report prepared by a state agency. *See Perkins v. State,* 61 Wis. 2d 341, 346 (1973) ("[T]his court has taken judicial notice of state records that are available at the seat of government in Madison that are easily accessible.").

year is difficult for a number of reasons. The 2010 Audit lists five reasons why estimating loss liabilities is challenging:

[1] claims that exceed the primary medical malpractice insurance thresholds established in statute typically are infrequent and involve severe cases;

[2] a medical malpractice claim may be filed years after an incident;

[3] there is no limit on the amount of economic losses the Fund may be required to pay;

[4] legislation and court decisions can significantly affect the Fund's liabilities; and

[5] the methodology and assumptions used by an actuary can significantly affect the result of an analysis.

2010 Audit, *supra,* at 6. Prior audits have determined that the Fund's loss liability calculation was "reasonable, although conservative." After incorporating some changes, the actuary completing a recent audit opined that the Fund's "current analyses are correspondingly less conservative than in the past." 2010 Audit, *supra,* at 7.

¶ 20. Based on the accrual accounting method, the Fund maintains sufficient assets, in the form of reserves, assessments, and investment income, to pay all outstanding liabilities if the Fund were discontinued. The Fund calculates its equity—the difference between total assets and total outstanding liabilities—based on this amount, and discounts its total outstanding liability by the amount of its estimated future investment income earnings. Investment of the Fund's reserves accounted for roughly 33 percent of the Fund's total revenue from its inception in 1975 to June of 2004. The Fund maintains long-term investments; it may

liquidate these investments to obtain cash, but doing so would result in diminished future earnings.

¶ 21. From its inception through March of 2005 (approximately 30 years), the Fund had paid approximately $586.3 million in total claims. By December 31, 2007, this number had increased to $666.1 million, and by December 31, 2009, it had increased to $770.8 million. Although annual expenditures have historically been lower than projected expenditures, it is difficult to predict when claims for any specific incident will be paid, and expenditures have the potential to increase greatly in the future if the amount of losses from claims incurred in previous years are paid. Depending on the length of litigation, some claims may take up to 20 years after the occurrence before they are paid.[8] Annual claim payments have steadily increased over the last four years, with the 2008–09 fiscal year seeing the largest annual payment of claims since the Fund's inception. 2010 Audit, *supra,* at 5.[9]

¶ 22. The board uses actuarial information to establish the annual health care provider assessments for each year. In 2005 the board adopted a policy of approving fee assessments at levels that would result in a zero accounting surplus/deficit for the Fund. This policy, which requires the board to maintain the Fund's net balance as close to zero as possible, was still in effect as of May 2008, although the record does not reflect whether it is still in effect. From the 1997–98 fiscal year

[8] For example, between 1990–91 and March 2005, the Fund paid $29.5 million in claims occurring in the 1990–91 fiscal year, and as of March 2005, two of those claims were still outstanding.

[9] From 1997 through 2006, claim payments averaged $25.7 million per year. By contrast, the total claim payments were $50.5 million for the 2007–08 fiscal year and $65.7 million for the 2008–09 fiscal year. 2010 Audit, *supra,* at 12.

through the 2005–06 fiscal year, assessments generally decreased each year. In the 2005–06 fiscal year, the board approved an average assessment increase of 25 percent, which the 2010 Audit attributed to this court's decision that the $350,000 inflation-adjusted limit on noneconomic damages was unconstitutional. *See Ferdon v. Wis. Patients Comp. Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440. After a new noneconomic damages limit was enacted,[10] the board approved smaller assessment increases for the 2007–08 fiscal year, and assessments did not increase in the 2008–09 fiscal year.

¶ 23. Since its inception, the Fund has generally taken in more income in the form of health care provider assessments and investment income than it has paid out in claims and other expenses. As of June 30, 2007, the Fund held a total of $798.5 million in assets, with a net asset balance of $94.4 million.

B. The 2007 Transfer

¶ 24. On October 26, 2007, the legislature enacted the Act, the 2007–2009 state budget. The Act contained a provision transferring a total of $200 million from the Fund to the MATF. 2007 Wis. Act 20, § 9225. The $200 million was to be transferred in two separate transfers: $71.5 million for fiscal year 2007–08 and $128.5 million for fiscal year 2008–09. The Act specified that the transfer was being made "[n]otwithstanding section 655.27(6) of the statutes," which provides that the Fund is held in irrevocable trust and may not be used for any other state purpose. The legislature then reduced general purpose revenue (GPR) funding for the MATF by $200 million. The Act also included a supplemental

---

[10] 2005 Wis. Act 183, § 6; Wis. Stat. § 893.55(4)(b).

appropriation of up to $100 million for paying claims if the Fund is unable to do so. 2007 Wis. Act 20, § 212p; Wis. Stat. § 20.145(2)(a).

¶ 25. Pursuant to the Act, the Department of Administration booked a transfer on the state accounting system of $71.5 million from the Fund to the MATF on October 29, 2007. On November 30, 2007, Secretary Morgan reported to the Chief Clerks of the Senate and Assembly that the Fund did not have $71.5 million available in liquid assets. He then temporarily reallocated $51.3 million from another state fund. The Fund has since been charged interest to cover this shortfall.[11] 2010 Audit, *supra,* at 17.

¶ 26. In response to actuarial recommendations that at least modest fee increases were necessary, assessment rates for the 2009–10 fiscal year were increased by an average of 9.9 percent. 2010 Audit, *supra,* at 10.

¶ 27. In July 2008 the remaining $128.5 million was transferred from the Fund to the MATF. As of June 30, 2009, the Fund had an outstanding loan in the amount of $76.8 million from the State Investment Fund to cover the negative balance it incurred due to the transfer. At that time, it had incurred $2.5 million in interest.

¶ 28. The Fund now has a total net asset deficit of $109 million. According to the 2010 Audit, the Fund had $645.1 million in total assets as of June 30, 2009. 2010 Audit, *supra,* at 35. At the same time, it had total loss liabilities—the amounts expected to be paid in the future for incidents that have already occurred—in the amount of $675.4 million. *Id.* Factoring in overdrafts due to the

---

[11] The Secretary cites Wis. Stat. § 20.002(11)(c) for the authority to charge interest after temporarily reallocating money in one fund to another fund.

State Investment Fund and other liabilities, as of June 30, 2009, the audit concluded that the Fund had a total net asset *deficit* of $109 million. *Id.*

## C. Procedural History

¶ 29. On October 29, 2007, the Medical Society filed a complaint in Dane County Circuit Court against the commissioner, Secretary Morgan, the state treasurer, and the board. Dr. Hoffmann later joined the suit as a plaintiff.[12] The Medical Society is the largest association of medical doctors in the state, with more than 11,000 members. Dr. Hoffmann is a practicing physician and "health care provider" who is required to pay assessments into the Fund.

¶ 30. The complaint alleged that the transfer would put the Fund in a serious deficit, prevent the Fund from realizing investment earnings on the transferred $200 million, and require the commissioner and the board to increase fee assessments to bring the Fund back to a zero accounting surplus/deficit. The complaint stated a number of causes of action, but only two—unconstitutional taking without just compensation and unconstitutional impairment of contract—were certified by the court of appeals.[13] The Medical Society sought, among other relief, a declaration that § 9225 of the Act constitutes an unconstitutional taking in viola-

---

[12] By the time the Medical Society and Dr. Hoffmann filed their amended summons and complaint, the commissioner, the state treasurer and the board were no longer parties to the lawsuit, and Secretary Morgan was the sole defendant.

[13] The Medical Society also alleged that the transfer constituted an invalid tax, an unconstitutional tax classification, a violation of equal protection, a breach of fiduciary duty, and a violation of Wis. Stat. § 655.27.

487

tion of Article I, Section 13 of the Wisconsin Constitution; a judgment directing Secretary Morgan to replace all funds removed from the Fund with lost earnings; a permanent injunction to prohibit Secretary Morgan from transferring monies out of the Fund; and recovery of all of the Medical Society's attorney fees from the Fund based on the common fund theory.

¶ 31. The circuit court granted summary judgment for Secretary Morgan. It dismissed the Medical Society's non-takings claims on grounds that they were barred by sovereign immunity. Although the takings claim was not barred by sovereign immunity, the circuit court dismissed it on grounds that the plaintiffs had failed to demonstrate that health care providers had a property interest in the Fund.

¶ 32. The circuit court concluded that the Fund did not create contractual obligations. It noted the "very strong" presumption against construing a statute to create contractual obligations. *See Dunn v. Milwaukee County,* 2005 WI App 27, ¶ 8, 279 Wis. 2d 370, 693 N.W.2d 82. The court also pointed to the fact that the 2003 bill revising Wis. Stat. § 655.27(6) had initially specified that health care providers had "contractual rights" in the Fund, but that this language was subsequently eliminated. *See* 2003 A.B. 487.

¶ 33. The circuit court also concluded that "the true nature of the Fund" demonstrated that the health care providers did not have a property interest in it. The court said that the providers "lack the normal indicia of a property interest" in the Fund. "They cannot sell it, pledge it as collateral, bequeath it, receive investment income from it, enjoy any appreciation in its value, or exercise any control over" the Fund. Furthermore, they receive the immediate benefit of excess insurance coverage, without any right to a refund. Only

the injured claimants ever receive payments. The court also relied on authority from other jurisdictions that have refused to find a property interest in funds that were funded by mandatory assessments in which the participants had no right to distribution. *See Miss. Surplus Lines Ass'n v. State of Miss.*, 442 F.Supp. 2d 335, 337 (S.D. Miss. 2006); *Fun 'N Sun RV v. Mich.*, 527 N.W.2d 468 (Mich. 1994). The court noted that the Fund was more analogous to any number of state government trust accounts than to a "strict, private irrevocable trust."

¶ 34. The court also contrasted the Fund with the Wisconsin Retirement System (WRS), which prior cases had determined created vested property interests. It cited *Wisconsin Retired Teachers Ass'n v. Employe Trust Funds Board,* 195 Wis. 2d 1001, 1025, 537 N.W.2d 400 (Ct. App. 1995), *aff'd,* 207 Wis. 2d 1, 558 N.W.2d 83 (1997), for the proposition that the WRS expressly provided for a "contractual right." The court also distinguished the WRS cases on grounds that employees with protectable property interests in the WRS have their own private accounts. Based on these distinctions, the court reasoned that the Medical Society "completely ignore[s] that what the Fund provides them is insurance coverage for which they pay a mandatory fee." This coverage, the court concluded, "under no reasonable view can be seen as compensation [for services rendered] any more [than] the office space they pay rent for, the clerical services they pay wages for, or the electricity they pay utility bills for."

¶ 35. The Medical Society appealed, and the court of appeals certified the case to this court. The court of appeals determined that whether health care providers have a protectable property interest presents an issue of first impression, along with the question of whether the

statute unconstitutionally repudiates the government's contractual obligations. It also noted the statewide importance of this case as discussed in the four amicus curiae briefs filed in the court of appeals.[14] We accepted certification.

## II. STANDARD OF REVIEW

¶ 36. The constitutionality of a statute is a question of law that this court reviews de novo. *State v. Wood,* 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63. Statutes enjoy a presumption of constitutionality. *State v. Quintana,* 2008 WI 33, ¶ 12, 308 Wis. 2d 615, 748 N.W.2d 447. We indulge every presumption to sustain the law. *Jackson v. Benson,* 218 Wis. 2d 835, 853, 578 N.W.2d 602 (1998). We resolve any doubt about a statute's constitutionality in favor of upholding the statute. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973).

¶ 37. Because of the strong presumption in favor of constitutionality, a party bringing a constitutional challenge to a statute bears a "heavy burden." *State v. Carpenter,* 197 Wis. 2d 252, 276, 541 N.W.2d 105 (1995). It is not sufficient for a party to demonstrate "that the statute's constitutionality is doubtful or that the statute

---

[14] The court of appeals did not address sovereign immunity in its certification on grounds that sovereign immunity could be resolved under current precedent. Secretary Morgan concedes, and we agree, that sovereign immunity does not bar a state law takings claim. Because we decide this case solely on the ground that 2007 Wis. Act 20 constituted an unconstitutional taking without just compensation, we do not address whether the Medical Society's other claims are barred by sovereign immunity.

is probably unconstitutional." *State v. Smith,* 2010 WI 16, ¶ 8, 323 Wis. 2d 377, 780 N.W.2d 90. Instead, the presumption can be overcome only if the party establishes "that the statute is unconstitutional beyond a reasonable doubt." *Id.* (quoting *State v. Cole,* 2003 WI 112, ¶ 11, 264 Wis. 2d 520, 665 N.W.2d 328).

## III. DISCUSSION

¶ 38. Article I, Section 13 of the Wisconsin Constitution provides: "The property of no person shall be taken for public use without just compensation therefor." An unconstitutional taking occurs when (1) a property interest exists; (2) the property interest has been taken; (3) the taking was for public use; and (4) the taking was without just compensation. *Wis. Retired Teachers Ass'n v. Employe Trust Funds Bd.,* 207 Wis. 2d 1, 18–24, 558 N.W.2d 83 (1997). When determining whether a taking occurred under this provision, we generally apply the same standards that are used to determine whether a taking occurred under the Fifth Amendment to the United States Constitution. *See Zealy v. City of Waukesha,* 201 Wis. 2d 365, 374, 548 N.W.2d 528 (1996) (holding that "[t]his court has adopted a similar method of inquiry" for determining regulatory takings as the United States Supreme Court); *see also Eternalist Found. v. City of Platteville,* 225 Wis. 2d 759, 773, 593 N.W.2d 84 (Ct. App. 1999).

¶ 39. There is no dispute that Secretary Morgan "took" money from the Fund, did so for public use, and did not compensate the Fund for this taking. The dispute in this case is limited to the threshold issue of whether the appellants have a protected property interest in the Fund. *See Wis. Prof'l Police Ass'n v. Lightbourn,* 2001 WI

491

59, ¶ 132, 243 Wis. 2d 512, 627 N.W.2d 807 (the "first step in analyzing an alleged taking is to determine whether a property interest exists"). Thus, if the health care providers have a property interest in the Fund, Secretary Morgan's actions to implement § 9225 of the Act constituted a taking without just compensation, in violation of Article I, Section 13 of the Wisconsin Constitution.

¶ 40. Because we conclude that the health care providers have a property interest in the Fund, we are satisfied that the Medical Society and Dr. Hoffmann have met their burden of proving that § 9225 of 2007 Wis. Act 20 is unconstitutional beyond a reasonable doubt. In reaching this conclusion, we begin by reviewing the basic requirements for determining whether a property interest is recognized under Wisconsin law and therefore entitled to constitutional protection. We then apply these principles to determine whether the health care providers have a protected property interest in the Fund.

A. Property Interests Under Wisconsin Law

¶ 41. Although the Wisconsin Constitution protects property interests, it does not itself create property interests. *Ass'n of State Prosecutors v. Milwaukee County,* 199 Wis. 2d 549, 558, 544 N.W.2d 888 (1996) (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 577). Rather, "[a] property interest is constitutionally protected if state law recognizes and protects that interest." *Thorp v. Town of Lebanon,* 2000 WI 60, ¶ 46, 235 Wis. 2d 610, 612 N.W.2d 59 (internal quotation and citation omitted).

¶ 42. Wisconsin law recognizes a variety of rights and interests in property. *See Penterman v. Wis. Elec. Power Co.,* 211 Wis. 2d 458, 480–81, 565 N.W.2d 521 (1997) ("[I]t is well settled that the rights of ownership and use of property have long been recognized by this state.").[15] A party has a property interest if he or she has a "legitimate claim of entitlement" to the property, as opposed to an "abstract need or desire" or "unilateral expectation." *Taplick v. City of Madison Pers. Bd.,* 97 Wis. 2d 162, 170, 293 N.W.2d 173 (1980) (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)); *Fazio v. Dep't of Emp. Trust Funds,* 2005 WI App 87, ¶ 11, 280 Wis. 2d 837, 696 N.W.2d 563 (reasoning adopted in *Fazio v. Dep't of Emp. Trust Funds,* 2006 WI 7, 287 Wis. 2d 106, 708 N.W.2d 326).

¶ 43. The parties disagree on the basic requirements necessary for a statutorily established trust fund to constitute a property interest protected by Article I, Section 13 of the Wisconsin Constitution. Relying primarily on this court's decision in *Lightbourn,* the Medical Society points to three sources of property interests: (1) statutory language describing the purpose and nature of the Fund; (2) beneficiaries' interest in the Fund's integrity and security; and (3) contractual rights in the Fund. Secretary Morgan, on the other hand, argues that health care providers have no property interest because they lack three rights: (1) right to free use of the Fund; (2) right to distribution from the Fund;

---

[15] "The Fifth Amendment [to the United States Constitution] attaches a broad meaning to the word property, consistent with the expansive meaning that the term had among the American founding fathers, the authors of the Constitution and the Bill of Rights." 2 *Nichols on Eminent Domain,* § 5.01[2][c], at 5–15 (3d ed. 2006).

and (3) contractual rights in the Fund. In other words, with the exception of contract rights—which both parties agree can be the source of a property interest—the parties disagree about the basic sources from which a property interest can arise in a statutorily established trust fund.

¶ 44. Although this court has never addressed the nature of health care providers' property interests in the Fund, the court has addressed the existence of property interests in the WRS. These cases set out the basic framework for determining whether participants have property interests in statutorily established trust funds. Over time, this court has set out a broad scope of participant property interests in trust funds that extends beyond narrow contractual rights.

¶ 45. An early case explaining participant rights in the state teachers retirement system was *State Teachers' Retirement Bd. v. Giessel,* 12 Wis. 2d 5, 106 N.W.2d 301 (1960). The court relied heavily on a contract analysis. The court said that the system was basically "a joint contributory money-purchase plan," *id.* at 8, and that "the teachers have a contractual relationship with the state and a vested right" in the retirement system, *id.* at 9. The court ruled that the legislature could not use retirement system funds to pay for a study of the retirement system.

¶ 46. In *Association of State Prosecutors,* this court addressed the constitutionality of legislation that created a uniform statewide pension plan for prosecutors. The legislation required Milwaukee County to transfer to the state plan employer contributions that had been made to the county retirement plan on behalf of unvested Milwaukee County prosecutors who had later become part of the state plan. *Ass'n of State Prosecutors,* 199 Wis. 2d at 552. The court began its

analysis by addressing whether the participants had a property interest in the county retirement plan, inasmuch as Milwaukee County had a "defined benefit" plan as opposed to the "defined contribution" plan in *Giessel*. *Ass'n of State Prosecutors,* 199 Wis. 2d at 559.[16] The court acknowledged that while the retirement fund in *Giessel* was different from the retirement plan at issue, it adhered to the general proposition that "vested employees and retirees have property interests in their retirement system." *Id.* at 559.

¶ 47. Thus, the court rejected the distinction between "defined contribution" plans—in which the employee's benefit is based upon the amounts contributed—and "defined benefit" plans—in which the employee's benefit is based upon a formula factoring in average salary and years of service. *Id.* at 560. The court explained why the distinction was immaterial:

> The structure of a pension plan merely delineates the method of financing the pension funds and determines the appropriate amount of employer contributions. *Any pension plan's ability to meet its obligations can be jeopardized when funds are taken from it, since every dime is arguably part of a management strategy dependent upon spreading the fund's monies as broadly as possible.*

*Id.* at 560 (emphasis added).

¶ 48. The court then turned to whether the transfer of funds would take property without due process of law. *Id.* at 561. The Association of State Prosecutors

---

[16] Although the court in *Association of State Prosecutors v. Milwaukee County,* 199 Wis. 2d 549, 544 N.W.2d 888 (1996), was deciding whether the transfer constituted a deprivation of property without due process, the threshold inquiry of whether the participants had a property interest in the plan is the same issue we decide in this case.

argued that because the transferred amount was small, the transfer did not diminish the benefits of any employees or retirees remaining in that Milwaukee County plan. *Id.* The court rejected this argument, reasoning that "[g]overnmental takings do not become exempt from due process requirements simply because they may be actuarially insignificant." *Id.* The Association further argued that a beneficiary's property interest would never be impaired because Milwaukee County would always be responsible for any shortfall. *Id.* The court again rejected this argument, reasoning that "[w]hile the specific transfer [at issue] may not immediately threaten the benefits of [the beneficiaries], *the precedent set by such a transfer certainly could." Id.* at 562 (emphasis added). The court concluded that if the legislature could order such transfers, "the actuarial soundness of the plan could eventually suffer." *Id.*

¶ 49. In *Retired Teachers Ass'n,* the court addressed whether annuitants had a property interest in a WRS account that paid out surpluses to annuitants. *Retired Teachers Ass'n,* 207 Wis. 2d at 18. Concluding that they did, the court began by noting that an annuitant's interest "finds its genesis both in [the statute establishing rights in the WRS] and in prior decisions of this court." *Id.* (citing Wis. Stat. § 40.19(1)). The statute read in part: "Rights exercised and benefits accrued to an employee under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act." Wis. Stat. § 40.19(1) (1987–88). The court then rejected the argument that annuitants had only a "unilateral expectation" of receiving surpluses. The property interest, the court concluded, was "the right of every annuitant to have surplus distributions made in a manner consistent with the [statute providing for distribution

of surpluses.]" *Id.* at 19–20. *Retired Teachers Ass'n,* in dealing with surpluses, appeared to go beyond "defined benefits" to capture benefits from the overall success of the system.

¶ 50. The court's most comprehensive analysis of participant rights in the WRS came in *Lightbourn,* which the Medical Society uses to establish its framework for determining the existence of property interests in the Fund. In *Lightbourn,* the court dealt with a constitutional challenge to legislation altering a number of different provisions in the WRS. *Lightbourn,* 243 Wis. 2d 512, ¶ 59. Among other claims, the plaintiffs argued that a transfer from one of the state accounts and a credit for employers constituted unconstitutional takings of private property. *Id.*

¶ 51. Although the court ultimately rejected the takings claims, it closely examined the source of participants' property interests in the WRS. *Id.,* ¶¶ 99–131. These interests arose, in part, from the participants' individual accounts, but "[b]eyond this narrow individual interest, each participant [also] has a broad property interest in the WRS as a whole." *Id.,* ¶ 100. Acknowledging that participants have contractual and vested rights in the state retirement system, the court went on "to articulate a more complete statement of the property interests and rights enjoyed by participants." *Id.,* ¶ 107.

¶ 52. The first source of a property interest the court identified was in Wis. Stat. § 40.19(1), which described participants' rights in the WRS. *Id.,* ¶ 108. The court noted that the language of the statute provided contractual rights in certain circumstances. *Id.,* ¶ 111.

¶ 53. The second source of a property interest was in Wis. Stat. § 40.01, "the nature and purpose of the

public employee trust fund." *Id.*, ¶ 113. In particular, the court said that the purpose of the Fund was "to aid public employees in protecting themselves and their beneficiaries against the financial hardships of old age." *Id.*, ¶ 114 (quoting Wis. Stat. § 40.01). The court also acknowledged the statute's declaration that the trust fund "is a public trust and shall be managed, administered, invested and otherwise dealt with" solely to fulfill benefit commitments at the lowest cost. *Id.* Similarly, the court cited language in the statute stating that the Fund "shall not be used for any other purpose." *Id.*

¶ 54. In addressing the trust aspect of the Fund, the court also acknowledged that the statutory language provided "specific safeguards to participants." *Id.*, ¶ 116. One of these was that "trust fund money must be used for proper trust purposes." *Id.* As an example of a non-trust purpose, the court referred to the transfer in *Association of State Prosecutors,* in which the court held that "[t]he state cannot simply 'reach' into the County Plan to pay for obligations [the state] has incurred." *Id.*, ¶ 118 (quoting *Ass'n of State Prosecutors,* 199 Wis. 2d 562–63).

¶ 55. The court then held that "legislative action affecting the WRS must be consistent with the stated objectives of the trust." *Lightbourn,* 243 Wis. 2d 512, ¶ 119. Again relying on *Association of State Prosecutors,* the court said that the legislature retained the power to adjust or amend a retirement plan, but that participants could challenge legislative actions "that deviate from trust objectives or cause injury to the trust." *Lightbourn,* 243 Wis. 2d 512, ¶ 119. Significantly, the court also noted that the Fund's board "must deal with the [WRS] in the same faithful manner as trustees would administer *any trust,* that is, they must exercise diligence, prudence, and absolute fidelity in

managing trust assets." *Id.*, ¶ 120 (citing *Sensenbrenner v. Sensenbrenner,* 76 Wis. 2d 625, 635, 252 N.W.2d 47 (1977) (emphasis added)).

¶ 56. The third source of property interests the court identified was "the integrity and security" of retirement funds. *Id.*, ¶ 121. We noted that this interest was articulated in *Association of State Prosecutors* and inherent in the statutes governing the WRS. *Id.* Accordingly, we held that the statutes gave participants "the right to protect their accounts from either abrogation or dissipation." *Id.*

¶ 57. In this case, both the circuit court and Secretary Morgan cite the statute's failure to establish contract rights to support the proposition that the health care providers lack a property interest in the Fund. This reasoning is too narrow. Article I, Section 13 protects a wide variety of property interests recognized by state law. Contract rights are not the sine qua non for a property interest in a state fund. In fact, we have specifically held that property interests arise from a much broader set of factors than contract rights. *See Lightbourn,* 243 Wis. 2d 512, ¶ 107 (articulating "a more complete statement of the property interests and rights enjoyed by participants" than contract rights); *see also Fazio,* 280 Wis. 2d 837, ¶ 14 (beneficiaries of WRS death benefits—as opposed to those directly contracting with the state—also obtain a property interest in their benefit once they meet the statutory requirements).

¶ 58. Examining these cases demonstrates that the court has considered a number of different factors when analyzing property interests in statutorily established trust funds. *Giessel* demonstrated that a contractual relationship is a source of property interests, and that principle remains sound. *Giessel,* 12 Wis. 2d at 9.

However, *Association of State Prosecutors, Retired Teachers Ass'n,* and *Lightbourn* recognize a broader scope of participant interests. These interests derive directly from statutory language and from the nature and purpose of the trust created by statute. In sum, they reflect the "longstanding view in Wisconsin law that trust funds are to be treated differently than general revenue, and that the state has less power to regulate the use of trust funds." Opinion of Wis. Att'y Gen. to The Honorable Michael G. Ellis, Chairperson, Senate Organization Committee, OAG 1–95, at 3 (Feb. 14, 1995).

¶ 59. Our "more complete" statement of property interests in *Lightbourn* is consistent with the legal standards applied by other courts to determine whether participants have property interests in statutorily established trust funds. They have held that vested property rights "may be created either by common law, by statute, or by contract." *Moran v. Okla. ex rel. Derryberry,* 534 P.2d 1282, 1288 (Okla. 1975) (quoting *Baker v. Tulsa Bldg. & Loan Ass'n,* 66 P.2d 45, 46 (Okla. 1936)). To have a vested right, a person must hold "title, legal or equitable, to the present or future enjoyment of property." *Fun 'N Sun RV,* 527 N.W.2d at 478 (quoting *Minty v. Bd. of State Auditors,* 58 N.W.2d 106, 111 (Mich. 1953)); *Pa. Med. Soc'y v. Dep't of Pub. Welfare,* Nos. 584 M.D. 2008, 585 M.D. 2008, 2010 WL 1491269, *9 (Pa. Commw. Apr. 15, 2010) (quoting *Konidaris v. Portnoff Law Assocs., Ltd.,* 953 A.2d 1231, 1242 (2008)) (vested rights arise from "title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from a demand made by another"). Vested rights may be constitutionally protected even if they are "beneficial" rights—such as rights in a trust estate—rather than legal or

possessory rights. *See Tuttle v. N.H. Med. Malpractice Joint Underwriting Ass'n,* 992 A.2d 624, 638 (N.H. 2010).

¶ 60. While *Lightbourn* did not purport to set out an exclusive set of factors, it provides the correct basic framework for determining whether a property interest exists. With the understanding that a property interest may arise from contract rights, specific statutory language setting out the nature and purpose of a trust fund and the security and integrity of an entire fund, as well as other factors, we now turn to whether the health care providers have a constitutionally protected property interest in the Fund.

## B. The Health Care Providers' Equitable Title in the Fund

¶ 61. Based on the principles articulated in *Lightbourn* and other cases, we conclude that the health care providers have a constitutionally protected property interest in the Fund. The health care providers' property interest is the equitable title to the Fund that they hold as named beneficiaries of the Fund. We reach this conclusion for two reasons. First, the Fund is unambiguously a formal trust under Wisconsin law in both name and form. Second, the beneficiaries of a trust have equitable title in a trust.

## 1. Existence of a Formal Trust

¶ 62. The legislature established a formal trust fund. The Fund is more than a trust in name. It has all three critical elements necessary to establish a trust,

namely, (1) trustees who hold property and are subject to equitable duties to deal with the property for the benefit of others; (2) beneficiaries to whom the trustees owe these equitable duties; and (3) trust property that is held by the trustees for the beneficiaries. *See Sutherland v. Pierner,* 249 Wis. 462, 467, 24 N.W.2d 883 (1946) (describing these three elements); *see also Artac v. DHFS,* 2000 WI App 88, ¶ 15, 234 Wis. 2d 480, 491–92, 610 N.W.2d 115.

¶ 63. First, the Fund has trustees who hold property subject to equitable duties to deal with the property for the benefit of others. Wisconsin Stat. § 655.27(2) states: "Management of the fund shall be vested with the board of governors." Furthermore, the Fund "is held in irrevocable trust for the sole benefit of health care providers participating in the fund and proper claimants." Wis. Stat. § 655.27(6). Read together, these two provisions unambiguously establish that the board is the trustee of the Fund.

¶ 64. The board's duty as trustee is recognized in our prior cases that have analogized the board to the trustee of a private trust. In *Strykowski,* this court acknowledged the Fund's duty to defend the trust estate, as well as its duty to deal impartially with beneficiaries: both the health care providers and proper claimants. *Strykowski,* 81 Wis. 2d at 518. The court concluded that the Fund did not violate its duties to the claimants by defending the trust "where the trustee reasonably determines that the claim is adverse to the trust." *Id.* The court analogized the trust to circumstances in a Colorado case involving a public pension: "It is within the power, and is the duty of a trustee to institute action and proceedings for the protection of the trust estate, . . . and to take all legal steps . . . reasonably necessary with relation to those objectives."

*Id.* (quoting *Brisnehan v. Central Bank & Trust,* 299 P.2d 113 (Colo. 1956)).

¶ 65. Wisconsin courts have described the board as a trustee in other situations. For example, this court held that the board could bring an action against an insurer that refused to contribute to a settlement in a claim against its insured, reasoning that it has the power "to perform all of the functions of trustees under the common law of trusts." *WHCLIP,* 200 Wis. 2d at 615 (citing *Strykowski,* 81 Wis. 2d at 518). Similarly, the court of appeals held that the Fund could sue to recover payments to an unqualified provider, on grounds that doing so was "reasonably necessary" to protect the trust. *Wis. Patients Comp. Fund v. St. Mary's Hospital,* 209 Wis. 2d 17, 40–41, 561 N.W.2d 797 (Ct. App. 1997) (quoting *WHCLIP,* 200 Wis. 2d at 615).

¶ 66. Because the Fund operates as a trust and the board is the trustee, the board's duties to the beneficiaries are analogous to those of a common-law trustee. Common-law trustees have fiduciary duties to beneficiaries. *Sutherland,* 249 Wis. at 466. Therefore, as the trustee of the Fund, the board has a fiduciary duty in managing the trust. *See Zastrow v. Journal Commc'ns,* 2006 WI 72, ¶ 22, 291 Wis. 2d 426, 718 N.W.2d 51. This means that the board has a duty of "undivided loyalty" to the beneficiaries of the Fund. *Id.,* ¶ 34 (quoting *Hammes v. First Nat'l. Bank & Trust Co. of Racine,* 79 Wis. 2d 355, 255 N.W.2d 555 (1977)); *see also Lightbourn,* 243 Wis. 2d 512, ¶ 120 (listing duties of ETF board).

¶ 67. The Fund also satisfies the second element necessary to create a trust: the existence of beneficiaries to whom the trustee owes equitable duties. This element is unambiguously established by statutory language. *See Lightbourn,* 243 Wis. 2d 512, ¶¶ 108, 113 (finding participant property interests in the language

of the statute, including a statute that sets out the nature and purpose of the public employee trust fund).

¶ 68. Wisconsin Stat. § 655.27(6) provides that *"[t]he fund, including any net worth of the fund,* is held in *irrevocable trust* for the *sole benefit* of health care providers participating in the fund and proper claimants." Wis. Stat. § 655.27(6) (emphasis added). Although the word "irrevocable" was not added until 2003, § 655.27(6) has always described the Fund as a "trust" held for the benefit of the health care providers (or "insureds" under the earlier statute) and proper claimants. Therefore, from the beginning, the statute specifically named health care providers as beneficiaries of the Fund.

¶ 69. The board's duty is not to manage the Fund for the Fund's benefit, but to manage the Fund for the "sole benefit" of the named beneficiaries. Wis. Stat. § 655.27(6). This key element is lacking in many state funds that set aside money for a specific purpose and are "trust funds" in name only.[17] Chapter 655 does more than set aside money for a purpose. It enumerates two specific and definite classes of beneficiaries: health care providers and proper claimants. *Id.*[18]

¶ 70. The existence of named beneficiaries is what transforms the Fund from money set aside for a purpose into a formal trust. To illustrate, in *Fun 'N Sun RV,*

---

[17] The primary analogy offered by Secretary Morgan is the transportation fund. Wis. Stat. § 25.40. However, the state manages a large number of trust funds, which are designated for specific purposes but do not identify specific beneficiaries. *See* Wis. Stat. § 25.17 (listing funds).

[18] "The members of a definite class of persons can be the beneficiaries of a trust." *See* Restatement (Third) of Trusts § 45 (2003). "A class is not indefinite for this purpose merely because it consists of a changing or shifting group, the number of whose members may increase or decrease." *Id.*, cmt. a.

cited by Secretary Morgan, the Michigan Supreme Court upheld the constitutionality of the state's sale of its accident fund to a private insurer. *Fun 'N Sun RV,* 527 N.W.2d at 482. In doing so, the court noted that earlier case law "did not expressly identify any beneficiary of the 'trust' to which [the statute] referred." *Id.* at 479 (discussing *Comm'r of Ins. v. Advisory Bd. of the Mich. State Accident Fund,* 434 N.W.2d 433 (Mich. Ct. App. 1988)). For this reason, the court conceived of the Michigan fund as a "trust" only "in an informal, descriptive sense, rather than as a declaration of a formal trust relationship." *Id.*

¶ 71. The description of the Michigan fund is in stark contrast to the way Wis. Stat. § 655.27(6) and previous cases describe the Fund: a formal trust with named beneficiaries. None of the other cases cited by Secretary Morgan involved a trust held for the benefit of expressly named beneficiaries and a board with fiduciary duties to those beneficiaries. *See Miss. Surplus Lines Ass'n v. Miss.,* 442 F. Supp. 2d 335, 337 (S.D. Miss. 2006), *aff'd* 261 Fed. Appx. 781 (5th Cir. Jan. 15, 2008); *Kelso & Irwin, P.A. v. State Ins. Fund,* 997 P.2d 591, 596 (Idaho 2000) (no provisions in statutory language provided property rights); *D. Corso Excavating, Inc. v. Poulin,* 747 A.2d 994, 1000–01 (R.I. 2000).

¶ 72. The third element of a formal trust is the existence of trust property. Wisconsin Stat. § 655.27(6) specifies that "[t]he fund is established" and that "any net worth of the fund" is held in irrevocable trust." As of June 30, 2007, just prior to the transfer, the Fund held roughly $798.5 million in total assets. 2010 Audit, *supra,* at 35. There is no question that trust property exists.

¶ 73. In sum, the legislature established the Fund as a formal trust. It underscored the nature of that trust in Wis. Stat. § 655.27(6). Beyond the legislature's express intent to establish a trust, the Fund meets the

three requirements for a trust under Wisconsin law: (1) trustees with duties to manage the trust on behalf of beneficiaries; (2) beneficiaries to whom the trustees owe equitable duties; and (3) trust property. The existence of these three elements is conclusively demonstrated by statutory language, prior case law, and the substance of the Fund's operation.

2. Beneficiaries' Equitable Title in the Trust

¶ 74. Because the Fund is a formal trust, and because the health care providers are named beneficiaries of the Fund, the health care providers have equitable title to the Fund.

¶ 75. The establishment of a trust creates two kinds of ownership: the trustees hold legal title to the trust and the beneficiaries hold equitable title, referred to as a "beneficial interest." Wis. Stat. § 701.05(2) (beneficiary of a private trust has "equitable interest"); *Sutherland,* 249 Wis. at 466 (beneficiaries of a trust have a "beneficial interest" in the trust property). The beneficiaries' equitable interest represents "the real ownership," while the trustee's legal title is "no more than the shadow, always following the equitable estate, which is the substance." Nossaman & Wyatt, 1 *Trust Administration & Taxation* § 1.04 at 1–13 (1992) (quoting *West Jersey Title & Guar. Co. v. Indus. Trust Co.,* 141 A.2d 782 (N.J. 1958)).

¶ 76. We recognize that the establishment of the Fund diverges from traditional trust principles in one significant way. Generally, the person establishing the trust (by expressing the intent to do so) *and* the person providing the money for the trust are the same person, referred to as the "settlor." *See* George Gleason Bogert & Amy Morris Hess, *The Law of Trusts and Trustees,*

§ 43 at 453 (3d ed. 2007) (settlor must have property interest to create a trust). In the case of the Fund, the legislature established the Fund, but the health care providers are the "settlors" insofar as they placed the money into the trust. This fact tends to confirm the health care providers' property interest in the Fund.

¶ 77. Health care providers and proper claimants have property interests in the Fund, but these interests have different bases. The health care providers are assessed mandatory fees. These assessments are enforced by the threat of fines or deprivation of a provider's license to practice medicine in Wisconsin. In sum, there is a link between the provider's assessment and the provider's license that goes well beyond a professional's normal licensing payment for regulation or service. Wisconsin Stat. § 655.27(6) recognizes this paid-for benefit as a property interest. By contrast, claimants have a property interest in the assurance that proper claims, including full economic damages, from medical malpractice will be satisfied, inasmuch as claimants have been forced to give up rights under conventional tort law to seek redress under the procedures and limitations of ch. 655.

¶ 78. The legislature could have chosen to establish the Fund with broad-based taxes and to hold the funds in trust for the health care providers. In that event, the legislature would have been the "settlor" in the traditional sense of both establishing the trust and providing the money for the trust. Instead, the legislature established the mechanism for the Fund, compelled health care providers to pool their money in it, and created a board to manage the Fund as a trustee. In doing so, the legislature did not establish the Fund out of public money for a specific purpose. Rather, the legislature, by enacting Chapter 655, facilitated the

507

pooling of private money in the trust and recognized and protected the health care providers' property interests in the resulting "estate."[19]

¶ 79. In sum, because the Fund is a formal trust, satisfying the necessary requirements for a trust under Wisconsin law, the health care providers have equitable title to the Fund. The existence of this equitable title is reinforced by the fact that the Fund is created from mandatory assessments on the health care providers themselves. Beneficial or equitable interests are constitutionally protected. *See Fun 'N Sun RV,* 527 N.W.2d at 478 (quoting 2 Cooley, *Constitutional Limitations* (8th ed.) at 749); *Pa. Med. Soc'y,* 2010 WL 1491269, at \*9; *Tuttle,* 992 A.2d at 638; 2 *Nichols on Eminent Domain,* § 5.02[2][a] at 5–46 (3d ed. 2006). Therefore, the health care providers' equitable title to the Fund is a constitutionally protected property interest.

C. Rights Arising from the Health Care Providers' Equitable Title

¶ 80. Having established that the Fund is a formal trust under Wisconsin law and that health care providers have equitable title to the Fund as named

---

[19] Recently, in holding that health care providers had vested rights in receiving abatements of their assessments into a patient's compensation fund that operates similarly to the Wisconsin Fund, the Commonwealth Court of Pennsylvania found it relevant that "doctors have to pay the assessment, or they cannot practice in the Commonwealth." *Pa. Med. Soc'y v. Dep't of Pub. Welfare,* Nos. 584 M.D. 2008, 585 M.D. 2008, 2010 WL 1491269, \*9 (Pa. Commw. Apr. 15, 2010). Although the Pennsylvania court specifically addressed the right to *abatements* of the assessments, their reasoning nonetheless supports our conclusion that health care providers obtain vested rights by paying mandatory assessments.

beneficiaries of the Fund, we now turn to the health care providers' three rights that flow from that equitable title. First, the health care providers have a property interest in the security and integrity of the Fund. Second, the health care providers have a right to realize investment earnings in the form of lowered assessments. Third, both health care providers and proper claimants have a right to the assurance that excess judgments will be paid by the Fund, so that additional litigation can be avoided and justice will be done.

1. Interest in the Security and Integrity of the Fund

¶ 81. The first right that flows from the health care providers' equitable title in the Fund is a right to the security and integrity of the Fund. Because the health care providers' property interest in the Fund is protected under Wisconsin trust law, the health care providers have a collective property interest in the entire Fund, even though individual health care providers do not have individual accounts. Any improper removal of money from the Fund infringes upon this right, and is likely to affect individual providers.

¶ 82. The health care providers' right to the security and integrity of the entire Fund flows naturally from the nature of the board's fiduciary duty to the beneficiaries. A fiduciary duty generally gives rise to a duty to manage the beneficiaries' assets "as a prudent investor would." *See* Wis. Stat. § 881.01(3)(a); *Hatleberg v. Norwest Bank Wis.*, 2005 WI 109, ¶ 20, 283 Wis. 2d 234, 700 N.W.2d 15 (trustee must guard the trust assets vigilantly); *Hegner v. Anna Van Rossum Estate*, 117 Wis. 2d 314, 321, 344 N.W.2d 160 (1984) (holding that

executors of an estate have many of the same duties as trustees, including the obligation to invest accumulated estate funds).

¶ 83. This principle applies to statutorily established trust funds as much as it applies to private trust funds. *See Attorney General ex rel. Blied v. Levitan,* 195 Wis. 561, 219 N.W. 97 (1928) (holding that because Annuity Board had a duty to invest retirement funds, the court would not "read into the law any limitations upon the methods which the board in the exercise of sound business judgment may employ to that end"). In *Lightbourn,* the court cited the ETF's duty to the WRS as part of the statutory "safeguards" that formed the basis of the participants' property interests. *Lightbourn,* 243 Wis. 2d 512, ¶ 120 (the board "must deal with the [WRS] in the same faithful manner as trustees would administer any trust"). Like the ETF board, the board here "must exercise diligence, prudence, and absolute fidelity in managing trust assets." *Id.*

¶ 84. The beneficiaries' property interest in the Fund naturally implies a right to the security and integrity of the Fund because such a right is the necessary corollary of the trustee's fiduciary duty; it is what triggers the trustee's fiduciary duty. If the beneficiaries did not have rights in the security and integrity of the entire Fund, then the board would have no duty to manage the Fund on the beneficiaries' behalf. The board's duty as "trustees under the common law of trusts," *WHCLIP,* 200 Wis. 2d at 615, established in chapter 655 and our case law, would be an illusion: it would be a duty to act for the sole benefit of beneficiaries whose interests depended upon legislative whim.

¶ 85. Our conclusion on this point is supported by the New Hampshire Supreme Court's recent decision in

*Tuttle.* *Tuttle* involved a transfer of money in New Hampshire's Medical Malpractice Joint Underwriting Association (JUA) to the state's general fund. *Tuttle,* 159 N.H. at 633. The JUA has been funded by surcharges on medical malpractice insurance policies and, if the plan experiences an excess of funds, the board managing the plan is required to reduce future assessments or distribute the excess. *Id.* at 636. Although the court held the transfer unconstitutional on impairment-of-contract grounds, its reasoning with regard to the assessments applies to the transfer from the Fund in this case:

> The policies entitle the policyholders to "participate in the earnings of the [JUA]" and the incorporated regulations mandate the board's application of excess funds in one or both of two specified ways: either against future assessments, or distribution to the policyholders. Under either option, the policyholders have a direct financial interest, and not a mere expectancy, in any excess surplus. Thus, the policyholders have a *vested right not necessarily in the distribution of the funds, but in the treatment of the funds for their benefit.*

*Id.* at 638 (emphasis added).

¶ 86. Like the policyholders discussed in *Tuttle* and the WRS participants discussed in *Lightbourn,* the health care providers here have a vested right in the treatment of the Fund's money for their benefit. This right is the essence of their right to the security and integrity of the Fund.[20]

---

[20] Because the health care providers collectively have an interest in the entire net worth of the Fund, it is irrelevant that they do not have private accounts from which to draw out of the Fund. The circuit court distinguished the WRS cases on the grounds that "[e]very public employee who has been recognized as having a protectable property interest in the WRS has their

¶ 87. In sum, because the health care providers have equitable title in the Fund protected by the trustee's fiduciary duty, they have a right to the security and integrity of the entire Fund.

2. Rights to the Realization of Investment Earnings

¶ 88. The second right that flows from the health care providers' equitable title in the Fund is a right to realize the investment earnings of the Fund through decreased assessments. Any improper transfer from the Fund infringes upon this right.

¶ 89. In assessing whether the beneficiaries' interests are significant enough to establish a vested property right, we again turn to basic trust principles. We consider whether the health care providers have a vested interest in the realization of investment earnings, or whether they have a "mere expectancy" to that money. *See Tuttle,* 159 N.H. at 627; *Wis. Academy of Sciences, Arts & Letters v. First Wis. Nat'l Bank of Madison,* 142 Wis. 2d 750, 761 n.9, 419 N.W.2d 301 (Ct. App. 1987); Restatement (Second) Trusts, § 86 (1959) ("An expectation or hope of receiving property in the future cannot be held in trust."). Even if a party's interest is contingent—rather than vested—it may still constitute property so long as it is more than a mere expectancy. *Sutherland,* 249 Wis. at 466; *Wis. Academy of Sciences, Arts & Letters,* 142 Wis. 2d at 761 n.9.

---

own private account." We have recognized, however, that while WRS participants have an interest in their individual accounts, "[b]eyond this narrow individual interest, each participant has a broad property interest in the WRS as a whole." *Wis. Prof'l Police Ass'n v. Lightbourn,* 2001 WI 59, ¶ 100, 243 Wis. 2d 512, 627 N.W.2d 807.

¶ 90. The health care providers have a vested interest in the success of the Fund, rather than a "mere expectancy." They have a direct interest in the performance of the Fund because that performance affects the amount of their assessments. It is true that they cannot be guaranteed their rates will decrease in a given year. Nonetheless, Wis. Stat. § 655.27(3)—which sets out the considerations on which annual assessments are to be based—establishes the health care providers' rights to have their rates determined based upon "[t]he past and prospective loss and expense experience of the fund." Wis. Stat. § 655.27(3)(a)(2).

¶ 91. This right to enjoy increases in the Fund's net assets through the form of reduced assessments is analogous to the participants' interest discussed in *Retired Teachers Ass'n.* In that case, the court rejected the argument that participants had only a "unilateral expectation" that they would receive distributions from the WRS surpluses, reasoning that they had a property interest in having the WRS surpluses distributed according to statute. *Retired Teachers Ass'n,* 207 Wis. 2d 1 at 19–20. Like the participants in *Retired Teachers Ass'n,* the health care providers have a vested right to have their rates set according to the factors outlined in Wis. Stat. § 655.27(3)(a).

¶ 92. This right is more than a "mere expectancy"; it is directly set out in the statute. Although the Fund can, and based on the actuarial assessment in the record, presumably would raise rates to restore its solvency, the provision that fees be assessed based on "[t]he past and prospective loss and expense experience" provides the health care providers with a clear right to have their rates set according to standard, enumerated considerations. *See id.; see also Moran,* 534 P.2d at 1288 (employers participating in Oklahoma worker's compensation

fund "had a vested legal right . . . to rely upon this trust being maintained and administered in accordance with" the applicable law). The right to faithful administration of the law is infringed when the diversion of Fund money for other state purposes forces the board and commissioner to (1) allow the Fund to operate at a deficit, potentially requiring future assessment increases when the Fund cannot pay excess judgments; or (2) raise assessments to restore the Fund's solvency.

¶ 93. Our conclusion on this point is again supported by the decisions of the New Hampshire Supreme Court and Commonwealth Court of Pennsylvania. In *Tuttle,* the court referred to two possible uses of surpluses: apply them against future assessments or distribute them. *Tuttle,* 992 A.2d at 638. It reasoned that "[u]nder either option, the policyholders have a direct financial interest, and not a mere expectancy, in any excess surplus." *Id.* The same is true here. The health care providers have a vested right in the Fund's surplus because it will either be returned to them in the form of lower assessments or reinvested for the Fund's future security.

¶ 94. Similarly, the Pennsylvania court determined that health care providers had equitable title, amounting to a vested right, in statutory abatements. Pa. Med. Soc'y, 2010 WL 1491269, at *9. Although Wis. Stat. § 655.27(3) does not provide for mandatory abatements, it provides a right to have the assessments set according to the statutory factors. In either case, the health care providers have vested rights in the management and use of their assessments for proper purposes.

¶ 95. Secretary Morgan contends that the State could constitutionally remove all money from the Fund except for the amounts necessary to pay claimants that had already made claims. If this theory were correct,

514

the State could deplete the Fund on an ongoing basis, requiring the board to continually raise assessments by the statutory maximum each year in an attempt to replenish the Fund to compensate proper claimants. Surely this would violate the health care providers' rights as beneficiaries. Yet, ongoing transfers would differ from the transfer here only in the gravity of the constitutional deprivation. *See Ass'n of State Prosecutors,* 199 Wis. 2d at 561 ("[t]he gravity of a property deprivation is irrelevant to the question of whether" a constitutional violation occurred). Therefore, the health care providers have a property interest in the entire net worth of the Fund because any removal of money from the Fund infringes upon their right to have their assessments set according to the factors in the statute. *See id.*

3. Right to the Payment of Excess Judgments

██

¶ 96. The third right that flows from the health care providers' equitable title in the Fund is a right to have judgments in excess of their required insurance paid on their behalf. By maintaining primary insurance and meeting the requirements of ch. 655, a health care provider's liability for malpractice is limited to the amount of his or her primary insurance. Wis. Stat. § 655.23(5). The Fund pays the excess. Wis. Stat. § 655.27(1). Under this arrangement, the Fund's payment of excess judgments benefits the health care providers because the payments are, in essence, made on the health care providers' behalf. They have a property interest in the payment of these excess judgments.

¶ 97. We recognize that the liability limitation provision under § 655.27(5) is not contingent on the Fund's payment of the excess judgment, and the board

itself is immune from liability for any obligation of the Fund. Wis. Stat. § 619.04(9). However, if the Fund were unable to pay excess judgments, proper claimants would be left without any recourse, except to challenge the constitutionality of the statutory scheme. Proper claimants are beneficiaries of the Fund. Therefore, even if we accepted the proposition that the removal of money from the Fund would not directly infringe upon the health care providers' right to enjoyment of and distribution from the Fund, that acceptance would not address the infringement of the proper claimants' property interests.

¶ 98. Secretary Morgan argues that there is no evidence the Fund cannot meet its obligations, and points to the $100 million supplemental appropriation contained in the Act.[21] We are not persuaded. First, a $100 million appropriation after a $200 million transfer from the Fund is, at a minimum, a net taking of $100 million. Second, the $100 million appropriation is illusory; no money has actually been set aside and the $100 million pledge could be withdrawn by the legislature as easily as the $200 million was transferred from the Fund. Third, even if we accept Secretary Morgan's factual assertion that the Fund's soundness was not jeopardized by this diversion of funds, that fact is

---

[21] Section 212p of the Act created Wis. Stat. § 20.145(2)(a), reading:

 20.145 (2) (a) Supplement for claims payable. A sum sufficient, not to exceed $100,000,000, for paying any portion of a claim for damages arising out of the rendering of health care services that the injured patients and families compensation fund under s. 655.27 is required to pay under ch. 655 but that the injured patients and families compensation fund is unable to pay because of insufficient moneys.

2007 Wis. Act 20, § 212p.

irrelevant because of the health care providers' interest in the security and integrity of the Fund. *See Ass'n of State Prosecutors,* 199 Wis. 2d at 560 ("Any pension plan's ability to meet its obligations can be jeopardized when funds are taken from it, since every dime is arguably part of a management strategy . . . "). Furthermore, while the transfer may not immediately threaten the Fund's beneficiaries, "the precedent set by such a transfer certainly could." *Id.* at 562. The transfer was a taking, regardless of the transfer's actuarial significance. *Id.* at 561.[22]

¶ 99. In sum, any removal of money from the Fund for an improper purpose is an unconstitutional taking of the health care providers' property interest in the Fund because it infringes upon their rights to the security and integrity of the Fund, to realize the Fund's investment earnings, and to have excess judgments paid to proper claimants. When money is improperly taken from the Fund, the health care providers are deprived of their right to have that money managed on their behalf. Furthermore, any such removal of money will almost certainly result in an increase in health care providers' assessments. If assessments are not raised, the solvency of the Fund is jeopardized, increasing the risk that the Fund will be unable to pay excess judgments. If the Fund becomes unable to pay excess judgments, the cost of those judgments will have to be borne by either the health care providers or the proper claimants, both of whom are the express beneficiaries of the Fund.

---

[22] Although the gravity of the actuarial impact on the Fund is irrelevant to whether a taking occurred, it bears noting that the Actuarial Assessment in the record and the March 2010 audit both suggest that the transfer significantly affected the Fund's soundness.

¶ 100. We emphasize again that the nature of the health care providers' interest must be understood in light of the statutory determination that the Fund is held in "irrevocable trust" for the "sole benefit" of the beneficiaries. This declaration codifies a private property interest that a future legislature is not free to confiscate.

¶ 101. We would be hard pressed to say that the legislature could not discontinue the Injured Patients and Families Compensation Fund prospectively, provided that it honored all loss liabilities created up to the date of discontinuation. The Fund is not immutable in its present form. But we are frankly taken aback by the Secretary's position that the legislature could discontinue the Fund and seize all its assets, save only those assets necessary to pay off *existing* claims, and renege on the loss liabilities to existing victims whose claims are not yet perfected. This is not only the logical extension of the Secretary's position, it is the actual articulation of the Secretary's position, both to the circuit court and before this court. A failure on our part to recognize the property interests at stake in the Fund would be an open invitation to the legislature to take money from the Fund at will.

¶ 102. We are sensitive to the changing needs of state government and the basic principle that one legislature cannot bind another. But that cannot mean that anything goes, that recognized property interests evaporate when the winds shift. The legislature created a "trust" for health care providers and their patients and families, and it pronounced that trust "irrevocable." We take the legislature at its word.

## IV. CONCLUSION

¶ 103. We conclude that the health care providers have a constitutionally protected property interest in

518

the Fund. Wisconsin Stat. § 655.27(6) defines the Fund as an irrevocable trust, and the structure and purpose of the Fund satisfy all the elements necessary to establish a formal trust. Because the health care providers are specifically named as beneficiaries of the trust, they have equitable title to the assets of the Fund.

¶ 104. The health care providers' equitable title in the Fund provides them with at least three corresponding rights. First, they have a right to the security and integrity of the Fund. Second, they have a right to realize the Fund's investment earnings to moderate, perhaps even lower, their assessments. Third, health care providers and proper claimants have rights to have excess judgments paid to the proper claimants. Any transfer of money from the Fund for an improper purpose infringes upon these three rights.

¶ 105. Because health care providers have protected property interest in the Fund, we conclude that 2007 Wis. Act 20, § 9225 authorized an unconstitutional taking of private property without just compensation.

¶ 106. Accordingly, we reverse the circuit court's order granting summary judgment in favor of Secretary Morgan and dismissing the Medical Society's suit. We remand with directions that the circuit court issue (1) an order requiring Secretary Morgan to replace the money removed from the Fund, together with lost earnings and interest that has been charged to the Fund; and (2) a permanent injunction prohibiting Secretary Morgan from transferring money out of the Fund pursuant to 2007 Wis. Act 20.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded to the circuit court.

¶ 107. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). "It's not fair," or "I don't like it," might be the first

reactions to the legislature's removal of $200 million from the Fund, which is made up of assessments paid by health care providers and used to pay out claims of victims of medical malpractice. I do not necessarily disagree with these sentiments, but they are not responsive to the question at hand.

¶ 108. The counter-reaction to "it's not fair" and "I don't like it" is that those sentiments do not render the legislation "unconstitutional." Well-settled principles of constitutional law, and of trust law, should not be distorted to accommodate a generalized sense of unfairness.

¶ 109. The standards and burdens of constitutional challenges to legislative action are familiar and well established: Challengers to the constitutionality of a statute have a heavy burden. As Justice Prosser aptly noted: "Our form of government provides for one legislature, not two. This court is not meant to function as a 'super legislature,' constantly second-guessing the policy choices made by the legislature and governor . . . ultimately, legislators make a judgment. If the people who elected the legislators do not like the solution, the voters have a good remedy every two years: retire those who supported laws the voters disfavor."[1] In our three-branch system of government, statutes are presumed constitutional.[2] A party who attacks the constitutionality of a legislative enactment in the courts must prove beyond a reasonable doubt

[1] *Ferdon ex rel. Petrucelli v. Wis. Patients Compensation Fund,* 2005 WI 125, ¶ 204, 284 Wis. 2d 573, 701 N.W.2d 440 (Prosser, J., dissenting) (internal quotation and citations omitted).

[2] *Ass'n of State Prosecutors v. Milwaukee County,* 199 Wis. 2d 549, 557, 544 N.W.2d 888 (1996) (citing *State v. Hart,* 89 Wis. 2d 58, 277 N.W.2d 843 (1979)).

that the statute is unconstitutional.[3] Our review of the acts of the other branches of government "is independent but deferential. Our duty is to uphold a legislative act if at all possible."[4]

¶ 110. In the present case, the legislature made a judgment. It may seem unfair, and neither the Medical Society nor members of this court may like or agree with that judgment. But the remedy for disliking the legislature's judgment is not found in this court unless the challenger has met the high standards established for proving a statute unconstitutional. Because the majority's analysis of the property interests at stake leaves great room for doubt and because the majority must strain principles of trust law to reach its result, I conclude that the Medical Society has not met the heavy burden of proving the unconstitutionality of the transfer of assets from the Fund beyond a reasonable doubt.

¶ 111. The relevant threshold inquiry in the present case is whether either the health care providers or victims of medical malpractice have a vested private property interest at stake in the Fund.[5] In other words, because it is their burden, the health care providers must demonstrate beyond a reasonable doubt they have

---

[3] *Id.* (citing *In matter of E.B.*, 111 Wis. 2d 175, 180, 330 N.W.2d 584 (1983)). A budget bill enjoys the same strong presumption of constitutionality as any other legislative enactment. *Wis. Retired Teachers Assn. v. Employee Trust Fund Bd.*, 207 Wis. 2d 1, 18, 558 N.W.2d 83 (1997).

[4] *Lightbourn,* 243 Wis. 2d at 561, ¶ 63.

[5] *Wis. Prof'l Police Ass'n, Inc. v. Lightbourn,* 243 Wis. 2d 512 (2001) (citing *Retired Teachers,* 207 Wis. 2d at 18); *see Bowen v. Pub. Agencies Opposed to Social Sec.,* 477 U.S. 41, 55 (1986)); majority op., ¶ 38–39.

a property interest, an entitlement to the assets which the Legislature transferred out of the Fund.[6]

¶ 112. I agree with the circuit court. The Fund is a state-managed pool of money mandatorily contributed by health care providers to enable them to acquire protection against personal liability for medical malpractice claims. The Fund is a government trust account in the sense that the Fund's governing entity is required to manage the monies in a particular way, but future legislatures may change the applicable statutes.

¶ 113. The health care providers do benefit from the Fund insofar as they receive excess insurance coverage from it, but the health care providers had no vested property interest in the $200 million which the legislature transferred. Without having met their burden of establishing a vested property interest, the Medical Society cannot sustain its claim that the transfer of assets from the Fund was an unconstitutional taking. Accordingly I conclude, as did the circuit court, that the Medical Society's challenge to the transfer as an unconstitutional taking must fail.

¶ 114. In contrast, the majority concludes that the Fund is a private trust. According to the majority, the health care providers are the settlors and the beneficiaries of the Fund. The majority thus locates the health care providers' vested property interest in the assets of the Fund as trust beneficiaries. In reaching this result, the majority makes key mis-steps in its analysis of trust law. I disagree with this contrived analysis. Because the majority must force the issue to arrive at its conclusion, it has not given honest effect to the constitutional

---

[6] *See* majority op., ¶ 42 ("A party has a property interest if he or she has a 'legitimate claim of entitlement' . . . as opposed to an 'abstract need or desire' or 'unilateral expectation.' ").

standard. "Wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality."[7] Because the majority's analysis leaves serious doubts, the Medical Society has not met its burden, and I cannot join the majority's result.

I

¶ 115. The majority opinion determines that in establishing the Fund the legislature established a formal trust, complying with the requirements of creating a private trust.[8] According to the majority, the health care providers are thus beneficiaries of a private trust and have a vested property interest in the assets of the Fund because they have equitable title to the Fund.

¶ 116. I conclude, as did the circuit court, that the Fund is not a formal trust. The Fund does have some characteristics of a trust,[9] and the legislature uses the term "trust" in the statute. However, the Fund lacks key elements of a formal trust and therefore cannot be considered a formal trust in which the health care providers hold equitable title to the Funds assets.

¶ 117. Regarding the statutory language, the word "trust" in the statute does not create a legal relationship tantamount to a private trust for individuals. The word "trust" governs how the funds are managed. This is analogous to numerous other public trust funds the Wisconsin legislature has created in the statutes. Indeed, chapter 25 of the statutes sets forth a

[7] *Lightbourn,* 243 Wis. 2d at 561, ¶ 64 (quoting *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973)).

[8] Majority op., ¶¶ 61–62.

[9] *See State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434 (1978).

long list of such trust funds. These include such funds as the transportation fund (Wis. Stat. § 25.40), the petroleum inspection fund (Wis. Stat. § 25.47), the conservation fund (Wis. Stat. § 25.29), and the agricultural chemical cleanup fund (Wis. Stat. § 25.468). The legislature regularly transfers monies from such trust funds into unrelated trust funds or the general fund. The use of the label "trust fund" creates no vested property interest on the part of persons, organizations or causes who may contribute to or benefit from those programs.

¶ 118. Regarding the majority's designation of the Fund as a formal trust, the majority errs. The majority opinion characterizes health care providers as settlors and beneficiaries as those terms are used in private trust law. Neither contention survives scrutiny against the black-letter rules of trust law.

¶ 119. According to the majority, health care providers are the settlors of the Fund insofar as they are the ones who have transferred property to the Fund by the payment of assessments.[10] According to private trust law, a settlor must have an intention to create a trust relationship for a trust to be established.[11] The majority opinion discusses the legislature's intent in establishing the Fund, *see* majority op., ¶ 73. But because it is the health care providers who place assets into the Fund and who the majority treats as the settlors, the health care providers' intention to create a trust relationship is critical. The health care providers, however, did not intend to create a trust relationship.

---

[10] Majority op, ¶ 76.

[11] Restatement of Trusts (Third) § 13 ("A trust is created only if the settlor properly manifests an intention to create a trust relationship.").

The health care providers have never properly manifested an intention to create a trust or to enter a trust relationship. The health care providers must pay assessments to gain the benefits of excess insurance coverage provided by the Fund and to avoid the repercussions of fines and "the deprivation of a provider's license to practice medicine in Wisconsin," which they might face if they did not pay assessments. *See* majority op., ¶¶ 13, 77.

¶ 120. Health care providers thus cannot be viewed as equivalent to the settlors of a private trust. The majority begins to admit that it has a problem in this regard.[12] But rather than adhering to the proper standard for constitutional review, which calls for the court to "uphold a legislative act if at all possible,"[13] the majority goes to great lengths to offer a creative application of formal trust principles to a situation where, in my opinion, it is at best a stretch to make them fit. Because the majority must stretch the law in its attempt to locate a vested property interest, it is improperly reallocating the presumptions and burdens of proof in a constitutional challenge to legislative action.

¶ 121. The majority faces a similar problem in its analysis of health care providers as beneficiaries of a trust. Although health care providers *benefit* from the Fund[14] insofar as they are entitled to excess insurance coverage from the Fund, they are not *beneficiaries* of the Fund in the private trust sense.

---

[12] *Compare* majority op., ¶ 61 ("the Fund is unambiguously *a formal trust*") (emphasis added) with ¶ 76 ("We recognize that the establishment of the fund diverges from traditional trust principles in one significant way.").

[13] *Lightbourn,* 243 Wis. 2d at 561, ¶ 64.

[14] Thus Wis. Stat. § 655.27 provides that the Fund is for "the sole benefit of health care providers and claimants."

¶ 122. The health care providers benefit from the Fund because they are buying liability insurance coverage. They pay mandatory fees to the state in exchange for insurance coverage. Purchasers of insurance benefit from buying insurance, but they are not beneficiaries of an insurance trust and they do not have a vested property interest in the money they pay for insurance coverage.

¶ 123. As I see it, the Fund is simply a mandatory state insurance scheme entrusted to the care of the Fund's governing entity and the insurance commissioner. The statutory purpose of the fund is fulfilled by ensuring that excess malpractice coverage is provided and that proper claims are paid. The majority's description of the Fund at ¶¶ 9–12 describes the Fund for what it is, a mandatory legislative system of providing excess insurance. While studiously avoiding the use of the word "insurance," the majority acknowledges that the Fund is "part of a broad legislative scheme" that limits "the liability of the health care provider and his or her insurer" and under which the Fund "pays out that portion of any medical malpractice claim in excess" of the provider's other required coverage.[15]

¶ 124. That the health care providers benefit from the Fund created to perform these functions says nothing more than that they benefit from the statutory mandatory insurance program. That the health care providers reap benefits does not make them beneficiaries with a vested property right in the assets of the Fund within the meaning of trust law. The majority's argument that the health care providers have property rights from equitable title to the assets of the Fund fails.

[15] The Legislative findings in § 1, ch. 37, Laws of 1975 refer to "increased insurance costs" and "the cost and difficulty of obtaining insurance for health care providers."

¶ 125. The circuit court was correct in holding that the true nature of the Fund was that of a government trust account, requiring the monies to be managed in a particular way but allowing future legislatures to change the statutes as they saw fit. This is consistent with numerous other public trust accounts created by the legislature, *see supra* ¶ 14.[16]

¶ 126. In summary, the health care providers are entitled to excess insurance coverage from the Fund, but this right cannot be transformed into a property interest in the Fund's assets and does not give rise to a constitutional takings claim.

## II

¶ 127. The majority relies on *Wisconsin Professional Police Association v. Lightbourn*, 2001 WI 59, 243 Wis. 2d 512, 627 N.W.2d 807, which according to the majority "provides the correct basic framework for determining whether a property interest exists." Majority op., ¶ 60. I will therefore compare *Lightbourn* and the present case.

¶ 128. In *Lightbourn* the court held that beneficiaries of the Wisconsin Retirement System had property rights. In the present case the court holds that the health care providers are the beneficiaries and have property rights.

---

[16] The majority attempts to get around the fact that this Fund is not a formal trust by pointing out characteristics that distinguish the Fund from other public trusts that are not formal trusts. Naturally each fund has different characteristics and different funding mechanisms. The fact that the Fund is distinguishable from other public trust funds does not give rise to vested property rights for the health care providers.

¶ 129. The interests of the participants in the Wisconsin Retirement System are easily distinguished from the interests of health care providers in the assets of the Fund.

¶ 130. The genesis of the property rights of employees in the Retirement System is in the statute's reference to contractual rights. Because the Fund is in form and function a state-managed insurance fund, any rights in the assets of the Fund must be found through contract. In fact, the cases the majority cites in which the court found property rights all found a contractual relationship between the party and the state.[17]

¶ 131. The property right of public employees recognized in the Wisconsin Retirement System cases in substantial part arose from the contract rights granted to them. Without those contract rights, no unconstitutional taking would have been recognized.

¶ 132. In the present case, the Medical Society has no contractual property rights in the Fund. In enacting Wis. Stat. § 655.27(6), the legislature chose to delete any reference to contract rights before enacting the statute.[18]

---

[17] *Tuttle v. N.H. Med. Malpractice Joint Underwriting Ass'n,* 992 A.2d 624 (N.H. 2010) (holding a transfer unconstitutional on impairment-of-contract grounds); *Fun 'N Sun RV v. Michigan,* 527 N.W.2d 468 (Mich. 1994) (upholding a provision that authorized the state to sell a state accident fund and retain the proceeds because participants had no specific contract or property right to the proceeds); *State Teachers' Retirement Bd. v. Giessel,* 12 Wis. 2d 5, 106 N.W.2d 301 (1960) (holding that "the teachers have a contractual relationship with the state and a vested right" in the retirement system); *Wisconsin Retired Teachers Ass'n v. Employee Trust Funds Board,* 195 Wis. 2d 1001, 1025, 537 N.W.2d 400 (Ct. App. 1995) (holding that the Wisconsin Retirement System expressly provided for a "contractual right").

[18] As the circuit court summarized:

¶ 133. Furthermore, the Wisconsin Retirement System can be distinguished from the Fund in that the participants in the Retirement System have their own private accounts. Every public employee who has been recognized as having a protectable property interest in the Wisconsin Retirement System has his or her own private account and will receive a dollar distribution calculated on his or her account. In contrast, health care providers do not have their own private accounts with the Fund, and they will not receive a dollar distribution from the Fund.

¶ 134. Moreover, in *Lightbourn,* all participants had a property interest in the entirety of the Retirement System fund, beyond the individual accounts. Because of their vested property rights in their own accounts, the participants in the Retirement System had an interest in ensuring that the retirement funds were used only for proper trust fund purposes and that the integrity and security of the trust funds were protected.

¶ 135. The statute creating the Fund does not create contractual obligations. Indeed, the majority does not base the health care providers' property rights to the assets of the Fund on a contractual relationship between the state and the health care providers.

¶ 136. In *Lightbourn,* despite the participants' vested property right in the Retirement System, the

---

[T]he legislative history suggests the legislature considered the idea and failed to expressly create a contract right when it amended § 655.27(6). 2003 Wis. Act 111 was originally introduced as 2003 Assembly Bill 487 with the language, "health care providers and claimants have contractual rights in all assets of the fund for these purposes." When Assembly Amendment 1 was passed and became, in part, the present § 655.27(6), the reference to "contractual rights" had been deleted and replaced with the insertion of "irrevocable" to modify trust.

court nevertheless concluded that the legislative changes to funding the system did not constitute a taking. The majority in *Lightbourn* allowed the State to direct monies from the System for non-retirement purposes. The *Lightbourn* court declared that the participants in the Wisconsin Retirement System "do not have a legal right to veto legislative decisions about benefit funding without showing some tangible injury." *Lightbourn,* 243 Wis. 2d 512, ¶ 179.

¶ 137. In contrast, in the present case, although there is not a contractual source of right as in *Lightbourn,* the majority surprisingly concludes that the legislative changes to funding the compensation system did constitute a taking. As I see it, the majority in the present case in effect adopts the position of the dissent in the *Lightbourn* case. The majority decision in *Lightbourn* and the majority decision in the present case are not consistent regarding the constitutionality of legislative changes in funding.

¶ 138. Unfortunately, an implication of the majority opinion's creating an "irrevocable" private trust in statutory form is that the legislature may be significantly limited in enacting future legislation.[19] In contrast, in *Lightbourn* the court was very careful to give the legislature room to change the System in future years.[20]

---

[19] The drafting records note that the word "irrevocable" was added in 2003 and does not strip the legislature of its right to amend legislation in a future legislative session.

[20] When a state is accused of impairing the obligations of its own contract, courts will scrutinize "the ability of the State to enter into an agreement that limits its power to act in the future." *Lightbourn,* 243 Wis. 2d at 594, ¶ 149 (quoted source omitted).

¶ 139. Finally, in *Lightbourn* the court held that the possibility of future increases in employee contributions as a result of the diversion of funds in that case was too speculative to render the statute unconstitutional. Thus, the desire of the Medical Society members to protect themselves from increased assessments is too speculative here to hold the statute unconstitutional. A desire for the lowest possible insurance assessments is not a property interest within the meaning of the Takings Clause.

¶ 140. The majority erroneously locates vested property rights where none exist. The Fund must be viewed as part of an overall legislative scheme governing medical malpractice and malpractice claims. The legislature intended to adopt various provisions relating to medical malpractice to stabilize medical malpractice insurance rates, to provide an incentive to practice in Wisconsin, and to help insure quality medical care in Wisconsin. The legislature did not intend to give health care providers a vested property interest in the Fund.

¶ 141. The majority has gone to great lengths in its novel and creative attempt to re-craft the law of trusts to locate a nonexistent vested property interest in this case. In the end, the effort fails, but the mere fact that such an attempt was necessary reveals that the majority has wandered far away from the proper allocation of the burden of proof and the standard of constitutional review in this case. That $200 million was transferred out of the Fund does not sit easy, but neither does distorting the standard of constitutional review to reach the majority's result in the present case. Even with the benefit of the majority opinion's considerable efforts, the Wisconsin Medical Society has not met its burden of showing beyond a reasonable doubt

that the transfer of money out of the Fund was unconstitutional.

¶ 142. For the reasons set forth, I dissent.

¶ 143. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.