# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP537 |
| COMPLETE TITLE: | Adams Outdoor Advertising Limited Partnership, Plaintiff-Appellant-Petitioner, v. City of Madison, Defendant-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 377 Wis. 2d 728, 902 N.W.2d 808
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 19, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 14, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Richard G. Niess |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | R.G. BRADLEY, J., dissents, joined by ROGGENSACK, C.J., and KELLY, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Eric M. McLeod*, *Jeffrey L. Vercauteren*, *Joseph S. Diedrich*, and *Husch Blackwell LLP*, Madison. There was an oral argument by *Eric M. McLeod*.

For the defendant-respondent, there was a brief filed by *Amanda J. Kaiser*, *Evan B. Tenebruso*, and *Boardman & Clark LLP*, Madison. There was an oral argument by *Evan B. Tenebruso*.

An amicus curiae brief was filed on behalf of the Outdoor Advertising Association of Wisconsin by *Thomas S. Hornig*, *Kraig A. Byron*, and *von Briesen & Roper*, *S.C.*, Madison.

An amicus curiae brief was filed on behalf of League of Wisconsin Municipalities by *Daniel M. Olson* and *League of Wisconsin Municipalities*, Madison.

2018 WI 70

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2016AP537
(L.C. No.   2014CV2497)

STATE OF WISCONSIN                    :         IN SUPREME COURT

Adams Outdoor Advertising Limited Partnership,

      Plaintiff-Appellant-Petitioner,

v.

City of Madison,

      Defendant-Respondent.

**FILED**

**JUN 19, 2018**

Sheila T. Reiff
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   ANN WALSH BRADLEY, J.   The petitioner, Adams Outdoor Advertising Limited Partnership, seeks review of an unpublished per curiam decision of the court of appeals affirming the circuit court's grant of summary judgment dismissing Adams' takings claim against the City of Madison.[1]   The court of appeals concluded that Adams failed to show that the City took any property requiring just compensation.   Specifically, it

---

[1] Adams Outdoor Advert. Ltd. P'ship v. City of Madison, No. 2016AP537, unpublished slip op. (Wis. Ct. App. July 20, 2017) (affirming judgment of the circuit court for Dane County, Richard G. Niess, Judge).

determined that Adams failed to demonstrate a cognizable right that underlies its asserted protected property interest.

¶2 Both parties agree that the City did not physically take any of Adams' property. They likewise agree that the City did not enact any zoning regulation restricting the use of previously acquired property interests. Instead, Adams asserts that its property was taken when the City constructed a pedestrian bridge over the Beltline Highway that blocked the visibility from the highway of the west-facing side of Adams' billboard.

¶3 According to Adams, the City took its property interest in its "vested rights in the legal nonconforming use" of its billboard. It alleges that a taking occurred because the City deprived it of all economically beneficial use of the west-facing side of its billboard, and therefore Adams is entitled to just compensation.

¶4 The City disagrees, arguing that Adams has failed to identify a recognized right sufficient to support its taking claim. Specifically, the City contends that property owners have no right to continued and unobstructed visibility of their property from a public road.

¶5 Like the court of appeals, we determine that a right to visibility of private property from a public road is not a cognizable right giving rise to a protected property interest. Because Adams' claim, in essence, rests on asserting this unrecognized right, its takings claim must fail. See Wis. Med.

2

Soc'y, Inc. v. Morgan, 2010 WI 94, ¶38, 328 Wis. 2d 469, 787 N.W.2d 22.

¶6  Accordingly, we affirm the decision of the court of appeals.

I

¶7  The billboard at issue in this case is located near the Beltline Highway in Madison on a single, irregularly shaped parcel of land, less than one-half of an acre in size. It is a single pole sign structure with two opposite-facing panels that was built in approximately 1995. One panel faces east and the other west, allowing for separate and distinct advertising messages.

¶8  Adams bought the irregularly shaped parcel of land containing the billboard for $200,000 in 2007. No other building or structure is located on Adams' land. Adams has not made any substantial improvements to its billboard since it purchased the parcel. Pursuant to Madison City Ordinance § 31.11(1), the billboard is nonconforming.[2] As such, the billboard is permitted to remain, but Adams cannot modify its height or location.

---

[2] Madison General Ordinance § 31.11(1) provides that "new, relocated and replacement advertising signs are prohibited." Madison, Wis., Gen. Ordinance § 31.11(1) (2015). However "[e]xisting advertising signs are nonconforming and permitted to remain" in specified districts, including certain commercial and industrialized districts. Id.

¶9 In 2013, pursuant to an agreement with the Wisconsin Department of Transportation, the City built the Cannonball Bridge (the bridge), a pedestrian and bicycle overpass crossing the Beltline Highway. The bridge is located adjacent to, but not on, Adams' property.

¶10 The bridge obstructs the view of the west-facing side of the billboard from Beltline traffic.[3] Adams asserts that since the construction of the bridge, it has not been able to sell advertising space on the west-facing panel of its billboard. The view from the east-facing side of the billboard remains unobstructed, and Adams continues to sell advertising space on the east-facing panel.

¶11 Adams' appraiser determined that before the construction of the bridge, the estimated value of Adams'

---

[3] Adams states that the bridge "completely" blocks the view of the west-facing sign. However, the City explained:

> [T]he west-facing side of the sign is not completely obscured. I've seen it several times myself. I know what it says. But the legal argument doesn't change, whether it's partially obscured or totally obscured. So if Adams wants for the summary judgment record to say that it's totally obscured, that's fine with me for purposes of the summary judgement decision.

At oral arguments before this court, the City reiterated that its stipulation that the bridge "completely" obstructs the view of the billboard was for the purposes of summary judgment only.

4

property was $1,460,000. After the bridge was erected, it asserts that the value of Adams' property declined to $720,000.[4]

¶12 Adams filed a complaint alleging in relevant part[5] that it has "constitutional protected property rights in [its] [p]roperty and [s]ign," and that the City has "occupied [its] [p]roperty and fully obstructed the west-facing [s]ign . . . ." It asserts that the City's construction of the bridge deprived Adams of substantially all beneficial uses of its property and sign. Therefore, according to Adams, it is entitled to initiate an inverse condemnation action pursuant to Wis. Stat. § 32.10 (2013-14)[6] because the City took its property and sign without compensation.

---

[4] The City's appraiser disputes those figures, concluding that Adams' appraiser "overstate[d] the diminution value" in the appraisal prepared for the purposes of this lawsuit. According to the City's appraiser, it was "hard pressed to understand th[e] substantial change in real estate market value" asserted by Adams' appraiser because Adams purchased the property for $200,000 in 2007, yet it was assessed at over $1.4 million seven years later when no substantial improvements had been made to the property.

[5] In its amended complaint, Adams asserted a variety of other claims against the City related to the construction of the bridge——namely trespass, nuisance, equal protection and due process violations, and a violation of the Highway Beautification Act. All were rejected by the lower courts. The only claim remaining before this court is Adams' takings claim.

[6] Wisconsin Stat. § 32.10——the inverse condemnation procedure——is the legislative direction for fulfilling the mandate of the just compensation clause of the Wisconsin Constitution. E-L Enters., Inc. v. Milwaukee Metro. Sewerage Dist., 2010 WI 58, ¶36, 326 Wis. 2d 82, 785 N.W.2d 409. It provides in relevant part:

(continued)

¶13 The City moved for summary judgment, arguing that Adams' takings claims must fail because it does not identify a recognized property right taken by the City. Specifically, the City contends that there is no property right to continued visibility of a billboard. Further, the City argues that Adams cannot prove that the City took its property because there was neither an actual physical occupation of Adams' property by the City, nor did the City deprive Adams of all or substantially all of the beneficial uses of its property.

¶14 The circuit court granted the City's summary judgment motion. Relying on Randall v. City of Milwaukee, 212 Wis. 374, 249 N.W. 73 (1933), it concluded that "there is no property right at issue that has been taken by the placement of this bridge over the highway in close proximity but not on the property belonging to the plaintiff" because "[t]here's no property right to be seen."

¶15 It further explained that "[w]hat we have instead is a consequential or incidental result of the construction and

---

If any property has been occupied by a person possessing the power of condemnation and if the person has not exercised the power, the owner, to institute condemnation proceedings, shall present a verified petition to the circuit judge of the county wherein the land is situated asking that such proceedings be commenced. . . . The court shall make a finding of whether the defendant is occupying property of the plaintiff without having the right to do so. . . .

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

6

maintenance [of the bridge] . . . which is . . . not a protectable interest that is if invaded subject to compensation for a taking." Finally, the circuit court determined that Zealy v. City of Waukesha, 201 Wis. 2d 365, 548 N.W.2d 528 (1996), requires that courts "value the billboard as a whole and not one side versus the other. And as a whole, it cannot be said that all or substantially all of the beneficial use of this property has been obstructed."

¶16 The court of appeals affirmed in an unpublished per curiam opinion. Like the circuit court, the court of appeals relied on Randall, 212 Wis. 374, to reach its conclusion that obstruction of a view is not a taking of private property. Adams Outdoor Advert. Ltd. P'ship v. City of Madison, No. 2016AP537, unpublished slip op., ¶¶8-10 (Wis. Ct. App. July 20, 2017).

¶17 Adams petitioned this court for review.

II

¶18 In this case we are asked to review the court of appeals' decision affirming the circuit court's grant of summary judgment in favor of the City, dismissing Adams' takings claims against the City.

¶19 This court reviews a decision granting summary judgment independently, applying the same methodology as does the circuit court. Shugarts v. Mohr, 2018 WI 27, ¶17, 380 Wis. 2d 512, 909 N.W.2d 402. "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Id.

7

III

¶20 The United States and Wisconsin Constitutions require payment of just compensation for private property taken for public use. The Fifth Amendment to the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Article I, Section 13 of the Wisconsin Constitution provides: "The property of no person shall be taken for public use without just compensation therefor." Wis. Const. art. I, § 13.[7]

¶21 In order to maintain an unconstitutional takings claim, four factors must be demonstrated: (1) a property interest exists; (2) the property interest has been taken; (3) the taking was for public use; and (4) the taking was without just compensation. Wis. Med. Soc'y, 328 Wis. 2d 469, ¶38 (citing Wis. Retired Teachers Ass'n v. Emp. Tr. Funds Bd., 207 Wis. 2d 1, 18-24, 558 N.W.2d 83 (1997)).

¶22 It is undisputed that the alleged taking here was for public use and the City did not compensate Adams for any damages sustained due to the construction of the bridge. Accordingly, the two disputed inquiries before this court are (1) whether a

---

[7] Wisconsin courts generally apply the same standard when determining whether an unconstitutional taking has occurred under the Wisconsin and United States Constitutions. Wis. Med. Soc'y, Inc. v. Morgan, 2010 WI 94, ¶38, 328 Wis. 2d 469, 787 N.W.2d 22 (citing Zealy v. City of Waukesha, 201 Wis. 2d 365, 374, 548 N.W.2d 528 (1996)).

property interest exists and, if so, (2) whether that property interest has been taken. <u>Wis. Med. Soc'y</u>, 328 Wis. 2d 469, ¶38.

A

¶23 We must first identify the precise property interest at issue. Once identified, we examine next whether that property interest exists, that is, whether it is based on a right recognized under our takings jurisprudence.

¶24 Adams asks this court to characterize the property interest at stake as the preexisting right to the legal nonconforming use of its property. The City contends that the property interest in question is grounded on the right to continued "visibility of private property from a public road."[8]

---

[8] The dissent errs by relying on a claim that is not made and facts that do not exist. It asserts that "the permit for the west-facing billboard" is the property interest at issue. Dissent, ¶47. This alternative definition of the property interest was first proposed in an amicus brief to this court by the Outdoor Advertising Association of Wisconsin. Neither party raised or briefed this alternative framing of the issue during the nearly four years of litigation in this matter.

In its complaint and amended complaint in the circuit court, Adams consistently and expressly framed its property interest as the "property rights in the [p]roperty and [s]ign." There is no mention of the billboard "permit" in Adams' amended complaint, or in its briefs to the court of appeals or this court. As further illustration that this case has nothing to do with a permit, neither party saw it necessary to introduce the permit into evidence. There is no billboard permit in this record.

Indeed, at oral arguments Adams conceded several times that it did not make a claim in this case that its billboard permit was the property interest that was taken:

(continued)

The court: You're not claiming here, are you, that you have a property interest in the permit? I didn't see it in your complaint, I didn't see the word permit in your briefs, so I didn't think you were claiming that.

Adams: I think we do have a property interest in the permit. But I don't think that the property interest in the permit has been specifically taken in this case. The nature of the takings claim is the obstruction of the sign face (emphasis added).

The court: . . . You're not claiming that in this case that the property that you want compensation for is the permit? Is that correct?

Adams: Not——That's correct, your honor. Not specifically.

Certainly Adams has forfeited any claim that the billboard permit constitutes a property interest. State v. Ndina, 2009 WI 21, ¶¶29-30, 315 Wis. 2d 653, 761 N.W.2d 612. Additionally, we decline to address this argument raised for the first time in an amicus brief, as it is not properly before us. Cty. of Barron v. LIRC, 2010 WI App 149, ¶30, 330 Wis. 2d 203, 792 N.W.2d 584 (citations omitted) (explaining that "courts need not consider arguments raised only by amici"). We save such a claim for another day.

The dissent also errs by relying heavily on facts not present in the record. Specifically, the dissent asserts that the City of Madison treats the two sides of its billboard as separate property by requiring an individual permit for each side, rather than issuing a single permit that covers the billboard structure as a whole. See dissent, ¶49. Indeed, this unsubstantiated factual allegation permeates the dissent's analysis. See id., ¶¶47, 55-56, 58-61, 63-69, 72-74.

At oral argument, the City disputed these alleged facts explaining that they are "not in the record" and that the City did not "believe that it's true" that separate permits were issued for each side of the billboard. The City explained:

[Counsel for Adams] stated in the oral argument today [that] it is a critical piece of the analysis that the City issued separate permits for the separate faces of

(continued)

10

¶25 Adams disagrees with the City's characterization of its property interest as relying on a "right to be seen." Before this court Adams asserts that "this case is not about a freestanding right to be seen" and that "[t]he outcome of this case does not depend on whether any generalized right to be seen exists."

¶26 In contrast, before the circuit court, Adams repeatedly emphasized the import of the right to be viewed when describing the property interest at issue:

> What is the protected interest? It's the legal nonconforming use, the vested rights that we have in maintenance of that use. And what is the use? It's the display of advertising signs that can be viewed by the public.

Adams further explained to the circuit court that "[t]he nature of this use is to be viewed. If there's no right to be viewed, then it is illusory that the rights, the pre-existing use that we've got is illusory. If it can't be viewed, we have no value. In this context it has to be a protected property right."

¶27 At oral arguments before this court, counsel for Adams stated that "[t]he issue that has been presented in this case is

---

the sign. Well there's a critical error in that argument. That being that that is not in the record. And I don't believe that it's true. There is some discussion in the amicus brief from the [Outdoor Advertising] Association regarding some law that the Association says would allow the City to do that, but there is nothing in the record to indicate that the City has actually treated the billboard that way and I don't believe that the City has. So that is a critical—critical problem.

whether Adams has the right to continue a preexisting use of its property, the sole purpose of which is to display advertising and be seen." Counsel for Adams explained further that:

> In this case the use that we are seeking to protect is the [] display of the billboard which is to be seen. I am not trying to suggest that our ability to be seen is not a critical piece of this but it is a critical piece of it by virtue of the specific use here, not because we are seeking to establish a right to be seen.

Thus, on one hand Adams disclaims that it is relying on a right to visibility of its billboard from a public road. On the other hand, Adams consistently refers to the "critical" fact that this case would not be before this court but for the fact that the sole harm it has suffered is to the visibility of its private property from a public road.

¶28 We decline to characterize the property interest here in the overly broad and generalized fashion advocated by Adams. Such an expansive framing begs the question: what is the essence of the property interest in dispute?

¶29 Adams' billboard continues to enjoy its legal nonconforming status. It is undisputed that the City neither physically altered Adams' property in any way, nor did it enact any regulation restricting the use of Adams' property. Thus, we determine that the essence of Adams' asserted property interest is based on a right to visibility. But for the reduction in visibility of Adams' billboard from a public road, there would be no asserted takings claim.

B

¶30 Having determined that the property interest asserted here is based upon a right of visibility of private property from a public road, we turn next to address whether it is a recognized property right under our takings jurisprudence. See Wis. Med. Soc'y, 328 Wis. 2d 469, ¶38; Luber v. Milwaukee Cty., 47 Wis. 2d 271, 278, 177 N.W.2d 380 (1970) (explaining that to determine whether there has been a taking, "a court of necessity must define property and determine what interests in property are significant enough to be protected from a taking without compensation").

¶31 The City asserts——and we agree——that Randall, 212 Wis. 374, is dispositive here. It provides that "[a]lthough [a property owner] may sustain consequential damages in so far as [a] street improvement will somewhat obstruct or interfere with ingress and egress, and the view to and from their land to the vehicular traveled portion of the street, that is not a taking of private property for public use . . . ." Id. at 382.

¶32 In Randall, the City of Milwaukee proposed to construct an underground pedestrian tunnel and a shelter covering the entrance to the tunnel that would abut Randall's property. Id. at 376-77. The proposed shelter would substantially obstruct and interfere with the ingress and egress to Randall's property and the view from the street of any building erected on Randall's property. Id. at 377. Randall argued that the construction of the subway shelter would constitute an unconstitutional taking because it would impair

13

Randall's property rights of "easements of access and view." Id. (emphasis added).

¶33 The Randall court disagreed, explaining that a property owner's rights "as an abutting owner are subject to such public street use and purpose as the location of the street requires." Id. at 378. As the Randall court explained:

> [A]cts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority. That has been the rule in this state.

212 Wis. at 382 (internal quotations omitted).

¶34 Randall reasoned that public thoroughfares, including highways, are dynamic spaces that must change and adapt over time. Id. at 378. It explained:

> Lands are set aside for public streets and highways, not for the present, with its necessities and modes of use, but for all time, with all the added demands that may be made upon the public ways within the scope of their original design, in the course of natural development that is constantly going on.

Id. (citation omitted). Thus, "the public rights in [streets] are plainly paramount" to those of private landowners. Id. at 380 (citation omitted).

¶35 Adams counters that Randall's conclusion that there is no recognized right to be seen from the street is limited to cases that deal with prospective, undeveloped uses of property where no vested rights were taken and nonconforming use status

14

was not at issue. We disagree. Neither Randall, nor various cases citing Randall, contain such limiting language. See, e.g., Howell Plaza, Inc. v. State Highway Comm'n, 92 Wis. 2d 74, 81, 284 N.W.2d 887 (1979); More-Way N. Corp. v. State Highway Comm'n, 44 Wis. 2d 165, 170, 170 N.W.2d 749 (1969); Wis. Power & Light Co. v. Columbia Cty., 3 Wis. 2d 1, 6, 87 N.W.2d 279 (1958).

¶36 Furthermore, it is well-established that "there is no property right to the flow of traffic along a highway." Surety Sav. & Loan Ass'n v. State Dep't of Transp. Div. of Highways, 54 Wis. 2d 438, 444, 195 N.W.2d 464 (1972); see also 118th St. Kenosha, LLC v. Wis. DOT, 2014 WI 125, ¶31, 359 Wis. 2d 30, 856 N.W.2d 486 ("The State may exercise its police power to authorize the relocation of a highway" and is "not always required to compensate all who are adversely affected by the relocation."); Hoffer Props., LLC v. State, DOT, 2016 WI 5, ¶26, 366 Wis. 2d 372, 874 N.W.2d 533 (explaining that "the legislature enabled DOT to periodically change the terms and conditions by which any person——abutter or otherwise——has access to a controlled-access highway").

¶37 Given that a private property owner does not have a right to the continued flow of traffic from a public road, it reasonably follows that it does not have a property interest in the continued visibility of its property from that road. See, e.g., Troiano v. Colo. Dep't of Highways, 463 P.2d 448, 455 (Colo. 1969) (explaining that because "a property owner has no right to have the traveling public pass his property, logically

15

it would be inconsistent to say that a property owner has a right to have the traveling public afforded a clear view of his property"); State, Idaho Transp. Bd. v. HI Boise, LLC, 282 P.3d 595, 603 (Idaho 2012) ("If . . . a property owner does not have a property right in traffic flow around his property, it directly follows that he cannot assert a property right in that same traffic's ability to see his property"); State v. Schmidt, 867 S.W.2d 769, 774 (Tex. 1993) ("Just as a landowner has no vested interest in the volume or route of passersby, he has no right to insist that his premises be visible to them.").

¶38 In sum, private property owners abutting public roads are aware that public roads are subject to change. See Randall, 212 Wis. at 378. There is an ever-present risk that public roads may be improved in any number of ways. Id. Streets are routinely expanded or relocated and can be elevated or modified by the construction of electrical poles, signage, or pedestrian shelters. Id. at 379-82. Often roads can be closed for an extended period of time due to construction. A myriad of examples exists.

¶39 Property owners are on notice that such changes may alter or obstruct the view of their private property from the public road. Id. at 379-81. It is not reasonable for a property owner to rely on the fact that it is located near a public road in a certain condition at a particular moment in time. See Surety Sav. & Loan Ass'n, 54 Wis. 2d at 444.

¶40 Numerous jurisdictions also have concluded that the right to visibility from a public road is not a recognized

16

property right.[9] Indeed, Adams fails to cite any jurisdiction recognizing a right to visibility of private property from a public road in the absence of a physical taking.[10]

---

[9] See, e.g., Reid v. Jefferson Cty., 672 So. 2d 1285, 1289-90 (Ala. 1995); Regency Outdoor Advert., Inc. v. City of Los Angeles, 139 P.3d 119, 121 (Cal. 2006); Troiano v. Colorado Dep't of Highways, 463 P.2d 448, 455 (Colo. 1969); Moreton Rolleston, Jr. Living Tr. v. Dep't of Transp., 531 S.E.2d 719, 722 (Ga. Ct. App. 2000); State, Idaho Transp. Bd. v. HI Boise, LLC, 282 P.3d 595, 602-04 (Idaho 2012); Stagni v. State ex rel. Dep't of Transp. & Dev., 812 So. 2d 867, 871 (La. Ct. App. 2002); Kansas City v. Berkshire Lumber Co., 393 S.W.2d 470, 474 (Mo. 1965); Probasco v. City of Reno, 459 P.2d 772, 774 (Nev. 1969); State ex rel. State Highway Comm'n v. Lavasek, 385 P.2d 361, 364 (N.M. 1963); Acme Theatres, Inc. v. State, 258 N.E.2d 912, 914-15 (N.Y. 1970); Adams Outdoor Advert. of Charlotte v. Dep't of Transp., 434 S.E.2d 666, 669 (N.C. Ct. App. 1993); Filler v. City of Minot, 281 N.W.2d 237, 244 (N.D. 1979); In re Condemnation by the Delaware River Port Auth., 667 A.2d 766, 769 (Pa. Commw. Ct. 1995); Outdoor Advert. Ass'n. of Tenn. v. Shaw, 598 S.W.2d 783, 788-90 (Tenn. Ct. App. 1979); State v. Schmidt, 867 S.W.2d 769, 774 (Tex. 1993); see also Malone v. Commonwealth, 389 N.E.2d 975, 979 (Mass. 1979).

Some jurisdictions take a more nuanced approach, providing that when there is a physical taking of private property, loss of visibility may be considered as an element of severance damages. See, e.g., 8,960 Sq. Feet, More or Less v. State, Dep't of Transp. & Pub. Facilities, 806 P.2d 843, 848 (Alaska 1991); State by Humphrey v. Strom, 493 N.W.2d 554, 561-62 (Minn. 1992); State by Comm'r of Transp. v. Weiswasser, 693 A.2d 864, 874-76 (N.J. 1997); Utah Dep't of Transp. v. Admiral Beverage Corp., 275 P.3d 208, ¶19 (Utah 2011). However, as the Supreme Court of New Jersey explained, "[t]he critical factor [] in determining if loss of visibility is a compensable element of damages in a partial-taking condemnation[] is whether the loss arises from changes occurring on the property taken." Weiswasser, 693 A.2d at 876 (emphasis added). Here, it is undisputed that there was no physical taking or change made to Adams' property.

17

¶41 For example, the California Supreme Court rejected a takings claim by a billboard owner who asserted that palm trees that did not physically occupy any land owned by the billboard company reduced the visibility of its billboards, constituting a taking. Regency Outdoor Advert., Inc. v. City of Los Angeles, 139 P.3d 119, 121 (2006). The California Supreme Court disagreed, concluding that "owners and occupiers of roadside property do not possess a 'right to be seen' that requires the payment of compensation for municipal landscaping efforts having no injurious effect on any property rights other than the claimed right to visibility." Id.

¶42 As here, the Regency court was assessing a takings claim in the context of a preexisting use of a billboard, where the sole harm alleged was that of loss of visibility from a public road. Id. at 122. The California Supreme Court explained that courts generally rely on three justifications for the "virtually unanimous" rule that there is no right to be seen from a public road. Id. at 125-27. Those justifications are: (1) road improvements that may limit visibility are foreseeable; (2) the government has the authority to maintain and improve the road system; and (3) the abridgment of the right to reasonable ingress and egress is an abutter's only right warranting

_____

[10] The dissent, too, appears to concede that the right to visibility from a public road is not a recognized property right. See dissent, ¶55 (listing four property interests at stake in this case, none of which includes a right of visibility).

18

compensation when the government acts to improve a road.  <u>Id.</u> at 127.

¶43 Adams attempts to distinguish <u>Regency</u> by asserting that the billboards in <u>Regency</u> were not "nonconforming."  Yet, Adams cites no authority for its proposition that owners of legal nonconforming property should be provided broader protection than legally conforming property owners.  As a policy matter, such an argument is unpersuasive.

¶44 Likewise, we do not find persuasive Adams' argument that the particular use of its land as containing solely a billboard gives rise to a right of visibility justifying special consideration under our taking law.[11]  Various courts have

---

[11] Before the circuit court, counsel for Adams argued:  "[A] property owner doesn't have an absolute right to unrestricted or unimpaired view of their property from some public space.  But that assumes that the nature of the use or the use of your property isn't solely to be viewed.  And that's what we've got here."

19

expressly rejected providing special consideration to billboard owners in this context.[12]

¶45 Further, we observe that Adams' complaint is not that the City has invaded or unfairly restricted its property. Rather, Adams takes issue with a consequence of the City's modification of public property. See Randall, 212 Wis. at 383; see also State ex rel. State Highway Comm'n v. Lavasek, 385 P.2d 361, 364 (N.M. 1963) (explaining that "[a]n easement of the right of view in an abutting property owner would create a burden on the servient tenement, the highway."). We decline to impose a burden on the City's ability to improve public roads here.

---

[12] See, e.g., Moreton Rolleston, Jr. Living Tr. v. Dep't of Transp., 531 S.E.2d 719, 722 (Ga. Ct. App. 2000) (concluding that impaired visibility of a nonconforming billboard from a highway due to the construction of a bridge does not constitute a taking and the "fact that [an owner] uses its property in a particular commercial manner does not change this result"); Outdoor Advert. Ass'n of Tenn. v. Shaw, 598 S.W.2d 783, 790 (Tenn. Ct. App. 1979) (rejecting the contention that "the licensing of a billboard confers some special right of visibility or imposes some special duty upon the State to maintain visibility of the licensed billboard"); In re Condemnation by the Delaware River Port Auth., 667 A.2d 766, 768 (Pa. Commw. Ct. 1995) (explaining that "what the [billboard] owner is losing, in fact, is the benefit——entirely unearned by him——to his land of the commercially exploitable proximity of heavy traffic. Since he has no right to this benefit and has done nothing to create it, he should have little cause to complain at losing it.") (citation omitted); see also Regency Outdoor Advert., Inc. v. City of Los Angeles, 139 P.3d 119, 128-29 (Cal. 2006); Adams Outdoor Advert. of Charlotte v. Dep't of Transp., 434 S.E.2d 666, 668 (N.C. Ct. App. 1993).

20

¶46 In sum, we conclude that a right to visibility of private property from a public road is not a cognizable right giving rise to a protected property interest. Because we determine that Adams failed to establish that a property interest exists here, we need not address whether a property interest was taken. See Wis. Med. Soc'y, 328 Wis. 2d 469, ¶38.

*By the Court.*—The decision of the court of appeals is affirmed.

¶47 REBECCA GRASSL BRADLEY, J. *(dissenting).* "Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." Murr v. Wisconsin, 137 S. Ct. 1933, 1943 (2017). The majority allows the constructive taking of Adams Outdoor's real property by misapprehending the property interest at issue to be a "right to visibility" rather than the permit for the west-facing billboard. See, e.g., Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶59, 294 Wis. 2d 441, 717 N.W.2d 803; Clear Channel Outdoor, Inc. v. City of Milwaukee, 2017 WI App 15, ¶¶10, 24, 374 Wis. 2d 348, 893 N.W.2d 24, review denied, 2017 WI 81, 376 Wis. 2d 641, 899 N.W.2d 704. Because the City of Madison deprived Adams Outdoor of all economically beneficial use of its permit by constructing a bridge that obliterated the permit's value, the court of appeals erred in affirming the circuit court's grant of summary judgment dismissing Adams Outdoor's inverse condemnation claim. I would reverse the court of appeals' decision and remand for a determination of the proper compensation owed for the constructive taking of the west-facing billboard permit. I respectfully dissent.

I

¶48 Adams Outdoor owns an irregular-shaped piece of land comprising less than half an acre in size along the Beltline Highway in Madison. The land's only "occupant" is a structure containing two billboards, also owned by Adams Outdoor. One billboard faces eastbound traffic and the other billboard faces

1

westbound traffic. The City of Madison treats each billboard as separate property by requiring an individual permit for each side. Madison, Wis., Gen. Ordinance § 31.041(3) (2015). Adams Outdoor paid separate fees to secure the required permit for each billboard, it must pay advertising copy change fees per side when the content displayed on the billboard changes, and it is taxed separately for the west-facing and the east-facing billboard permit. Adams Outdoor owns the permits.[1]

¶49 Many years ago, the City of Madison enacted an ordinance banning any new off-premise advertising signs. See Madison, Wis., Gen. Ordinance § 31.11. As a result of the ordinance, no new permits may be issued for any billboards not already in existence. The billboards with permits predating the ban are classified as legal, nonconforming signs. Id., § 31.05. As property that is finite and restricted as legal-nonconforming use by Madison's zoning ordinances, permits for existing billboards carry significant value. See Adams Outdoor Advert., Ltd., 294 Wis. 2d 441, ¶85 ("Value primarily inheres in the permit because the City has severely restricted the number of permits, artificially driving up their value.").

¶50 The land upon which Adams Outdoor's billboard sits was valued at $1.46 million before the construction of the bridge. After the bridge was erected, the value of the land dropped to

---

[1] Because a billboard permit is real property, the permit holder is referred to as the permit owner. See, e.g., Clear Channel Outdoor, Inc. v. City of Milwaukee, 2017 WI App 15, ¶13, 374 Wis. 2d 348, 893 N.W.2d 24, review denied, 2017 WI 81, 376 Wis. 2d 641, 899 N.W.2d 704.

$720,000. For purposes of this appeal, it is undisputed that the bridge completely obscures the west-facing billboard.

¶51 The majority identifies "the essence" of Adams Outdoor's property interest to be "based upon a right of visibility of private property from a public road," denies a property owner any "property interest in the continued visibility of its property," and declines to address whether a taking occurred. Majority op. ¶¶29-30, 37, 46 ("In sum, we conclude that a right to visibility of private property from a public road is not a cognizable right giving rise to a protected property interest."). As a result, Adams Outdoor loses the freedom to use its property as it wishes and instead must submit to the government's preferences.

II

¶52 Whether the City's construction of a bridge constructively took Adams Outdoor's property is a question of law reviewed independently. See Howell Plaza, Inc. v. State Highway Comm'n, 92 Wis. 2d 74, 80, 284 N.W.2d 887 (1979). Both the Wisconsin Constitution and the United States Constitution prohibit the City from taking Adams Outdoor's property without just compensation. Wis. Const. art. I, § 13 ("The property of no person shall be taken for public use without just compensation therefor."); U.S. Const. amend. V. ("[N]or shall private property be taken for public use, without just compensation."). In order to establish an unconstitutional taking, Adams Outdoor needs to show: "(1) a property interest exists; (2) the property interest has been taken; (3) the taking

3

was for public use; and (4) the taking was without just compensation." Wis. Med. Soc'y, Inc. v. Morgan, 2010 WI 94, ¶38, 328 Wis. 2d 469, 787 N.W.2d 22. "[I]t is 'imperative that the Court maintain absolute fidelity to' the [Takings] Clause's express limit on the power of the government over the individual, no less than with every other liberty expressly enumerated in the Fifth Amendment or the Bill of Rights more generally." Kelo v. City of New London, 545 U.S. 469, 507 (2005) (Thomas, J., dissenting) (quoting Shepard v. United States, 544 U.S. 13, 28 (2005) (Thomas, J., concurring in part and concurring in judgment)).

¶53 A property owner proves a taking when a government regulation or action denies him all or substantially all practical uses of his property. Zealy v. City of Waukesha, 201 Wis. 2d 365, 374, 548 N.W.2d 528 (1996). Stated otherwise, a taking occurs when the government denies a property owner all "economically viable use of his [property]." Id. (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992)).

¶54 In order to determine whether the government deprived an owner of all or substantially all economically viable use of property, a court first must define the property interest——commonly deemed the "denominator" because the court must compare the value taken from the property with the value that remains and the property's value therefore "furnish[es] the denominator of the fraction." Id. at 375 (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)). Defining the denominator drives the analysis. The United States Supreme

4

Court offers guidance in properly identifying the denominator——the property interest:

> [N]o single consideration can supply the exclusive test for determining the denominator. Instead, courts must consider a number of factors. These include the treatment of the [property] under state and local law; the physical characteristics of the [property]; and the prospective value of the regulated [property]. The endeavor should determine whether reasonable expectations about property ownership would lead a [property ]owner to anticipate that his holdings would be treated as one parcel, or, instead, as separate [property]. The inquiry is objective[.]

Murr, 137 S. Ct. at 1945.

A

¶55 Ascertaining the denominator——identifying the property interest——presents the threshold issue for the court to resolve. "[T]he answer to this question may be outcome determinative." Id. at 1944. This case involves several distinct property interests: (1) the half-acre of land; (2) the permit for the west-facing billboard; (3) the permit for the east-facing billboard; and (4) the billboard structure itself.[2] Adams Outdoor owns all four pieces of property.

¶56 The majority avoids selecting any of these as the denominator; instead, it defines the property interest as the "right to visibility." In so doing, the majority ignores the essential fact that the west-facing billboard permit itself

---

[2] The billboard structure itself is not real property; rather, it is personal property assessed separately from the permit and the land. Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶¶31, 33, 294 Wis. 2d 441, 717 N.W.2d 803; Clear Channel Outdoor, Inc., 374 Wis. 2d 348, ¶¶6-10.

constitutes individual real property and the correct denominator in the takings analysis. Consequently, the majority reaches a legally erroneous outcome.

¶57 In Murr, the United States Supreme Court identified state law treatment of the property as a factor for determining the denominator. 137 S. Ct. at 1945. In Adams Outdoor Advert., Ltd., 294 Wis. 2d 441, ¶59, this court recognized that a billboard permit itself is individual real property: "We conclude that a billboard permit is a right or privilege appertaining to real property and thus falls within the definition of 'real property' in Wis. Stat. § 70.03."[3] "Because a billboard permit confers a right or privilege to erect and operate a billboard on a designated piece of land and because a permit cannot be transferred to a different location, we conclude a billboard permit falls within the definition of real property." Id., ¶64.

¶58 Our court of appeals recently reiterated the same legal principle——"billboard permits are real property" and "the permit is the entire property itself." See Clear Channel Outdoor, Inc., 374 Wis. 2d 348, ¶¶10, 24. This legal classification of billboard permits as real property distinct from both the billboard itself and the land upon which the structure sits points powerfully to the west-facing billboard permit as the proper denominator.

---

[3] Wisconsin Stat. § 70.03 defines real property as "not only the land itself but . . . all fixtures and rights and privileges appertaining thereto[.]"

¶59 Under Murr, courts must "give substantial weight to the treatment of the [property], in particular how it is bounded or divided, under state and local law." 137 S. Ct. at 1945. Wisconsin law plainly designates billboard permits as real property, separate and distinct from the land with which they are associated. See Clear Channel Outdoor, Inc., 374 Wis. 2d 348, ¶24 (agreeing with the circuit court's conclusion "the permit is the entire property itself."). The west-facing billboard permit is separate and distinct from both the billboard structure and the land the structure inhabits. The City's treatment of the permit as separate property lends further support for designating the west-facing billboard permit as the denominator. The City: (1) requires a separate permit for each side of a billboard, rather than issuing a single permit that covers the billboard structure as a whole; (2) charges fees for each permit (rather than each billboard); and (3) assesses distinct property taxes on each permit. According these considerations substantial weight, as Murr directs, militates in favor of designating the west-facing billboard permit the appropriate denominator.

¶60 The second Murr factor directs courts to examine the physical characteristics of the property. 137 S. Ct. at 1945. In Murr, the Supreme Court determined that two separate but contiguous parcels of land together constituted the denominator in the takings analysis. Id. at 1948-50. In this case, there is a single parcel of land, a billboard structure, and two billboard permits. Obviously, the physical characteristics of a

7

billboard permit——unlike the land at issue in Murr——are irrelevant to a takings analysis. Such a permit is intangible; nevertheless, it is valuable and it is what gave the small, irregular-shaped parcel of land adjoining the Beltline Highway its $1.46 million value before the City erected the bridge. After the City built the bridge, the land parcel's value plummeted fifty percent. The west-facing permit lost its entire worth, while the unaffected east-facing permit retained its full value.

¶61 Each permit's value depends entirely on prospective advertisers' willingness to rent the permitted billboard. In this regard, the physical characteristics of the billboard structure become relevant. City ordinance prohibits altering the structure in any manner that would restore the permit's value. However, in order to ameliorate the obstruction caused by the City's construction of the bridge, the billboard structure would need to move or be heightened. This is impossible because a City ordinance bans relocating, enlarging, repositioning, or raising in height any legal non-conforming sign. See Madison, Wis., Gen. Ordinance § 31.05; see also Adams Outdoor Advert. Ltd. P'ship v. City of Madison, No. 2016AP537, unpublished slip op., ¶2 (Wis. Ct. App. July 20, 2017) (per curiam) ("Adams' billboard is a legal non-conforming use, which means that Adams cannot change its height or location."). As a result, Adams Outdoor is left with a small, half-acre of irregularly-shaped land adjoining the Beltline Highway, on which sits one rentable sign, the value of which is half what it was

8

when the land enjoyed two rentable signs. The physical characteristics of this parcel suggest its only valuable use is to anchor signage; otherwise, its value would not be so precisely tied to the two signs posted there.

¶62 The City argues that Zealy, 201 Wis. 2d at 365, and Randall v. City of Milwaukee, 212 Wis. 374, 249 N.W. 73 (1933), govern the outcome in this case. But the properties in both Zealy and Randall were solely physical land parcels and neither case dealt with the complexities of a combination of land with other real property like the billboard permits we consider in this case. The status of the billboard permit as separate, standalone real property distinguishes this case from both Zealy and Randall. In Zealy, the property owner was farming 10.4 acres of a single piece of contiguous, undeveloped land but anticipating residential use in the future. 201 Wis. 2d at 369-70. The City rezoned 8.2 acres from residential to conservancy use. Id. at 370-71. This zoning change did not impair the property owner's ability to continue the existing farming use, but it did preclude the property owner from developing 8.2 of the 10.4 acres into residential property. Id. The Zealy court held this was not a taking because (1) the land was one contiguous property——"part of a single purchase"——that should not be divided into segments; and (2) looking at the property as a whole, the rezoning did not deprive Zealy of "all or substantially all of the use of his land"——Zealy retained beneficial and substantial uses for his property, including "its historical use, farming." Id. at 378-80.

9

¶63 In contrast, the affected property of Adams Outdoor is not a single, contiguous plot of land acquired in a single purchase and Adams Outdoor does not wish to change the nature of its use of the property in the future. Rather, Adams Outdoor owns several distinct units of property it desires to use in exactly the same manner it had always used the property, until the City materially interfered. Although the west-facing permit is connected in a sense to the other property, it is nonetheless treated as a distinct unit of individual real property under the law. Unlike Zealy, in which the property owner's use was unchanged by the rezoning, the bridge altogether extinguished Adams Outdoor's use of the west-facing billboard permit, thereby denying Adams Outdoor all economically viable use of not merely a segment of its property but the whole thing; no beneficial use of the west-facing permit remains.

¶64 Like Zealy, Randall also involved an undeveloped piece of contiguous land. The City of Milwaukee placed a pedestrian shelter on the sidewalk in front of part of the property owners' land, which abutted the street. Randall, 212 Wis. at 376. The Randall court decided the shelter did not cause a taking of the owners' property because the shelter only "somewhat obstruct[ed] or interfere[d] with ingress and egress, and the view to and from their land" to the street. Id. at 382. The Randall court suggested this "impairment" could result in the landowner collecting consequential damages from the City under Wis. Stat. § 80.47, but concluded the act was not a taking. Id. at 383-84. Like Zealy, Randall does not control this case because the City

of Milwaukee merely impaired the property owners' use of the single, contiguous parcel of land whereas in this case the City of Madison extinguished all use of the separate and distinct unit of real property owned by Adams Outdoor.[4] Neither Zealy nor Randall compels us to artificially meld the half-acre of land, the billboard, and the two permits into a single piece of property.

¶65 The third Murr factor examines "the value of the property under the challenged [governmental action], with special attention to the effect of burdened land on the value of other holdings." 137 S. Ct. at 1946. The west-facing billboard permit possessed significant value before the bridge was constructed. Its substantial value rested in the right to erect and maintain a billboard that the permit authorized. This is evident from the appraised value of the plot of land upon which the billboard sits. When both the west-facing billboard permit and the east-facing permit could be beneficially used, the land enjoyed an appraised value of $1.46 million, but when only one of the permits could be beneficially used, the land's appraised value declined to $720,000. This drastic diminution in value indicates the west-facing billboard permit's value after the erection of the bridge is zero. In effect, the City's construction of the bridge constructively revoked the permit by

---

[4] Significantly, Randall does acknowledge that "an owner of land abutting on a street has the right" of, among other things, "view"; the right to view is "subject to such public street use and purposes as the location of the street requires." Randall v. City of Milwaukee, 212 Wis. 374, 374, 249 N.W. 73 (1933).

11

abolishing Adams Outdoor's ability to employ any economically beneficial use of its west-facing billboard permit. The third Murr factor also supports designating the permit as the appropriate denominator.

¶66 Based on Wisconsin case law recognizing the billboard permit as the "entire" real property in and of itself, the permit for the west-facing sign is the appropriate denominator for assessing whether a constructive taking occurred, a conclusion that is bolstered by the Murr factors.

B

¶67 Having decided the proper denominator, the remaining question is whether the City's construction of the bridge constituted a compensable taking of Adams Outdoor's west-facing billboard permit. A compensable taking occurs if the City's action denied Adams Outdoor of all or substantially all "economically beneficial or productive use" of its property. See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992); see also Dolan v. City of Tigard, 512 U.S. 374, 385 (1994); Zinn v. State, 112 Wis. 2d 417, 424, 334 N.W.2d 67 (1983) (taking occurs "when the government restriction placed on the property 'practically or substantially renders the property useless for all reasonable purposes'" (quoted source omitted)).

¶68 The only economically beneficial or productive use of the west-facing billboard permit is renting the west-facing billboard to advertisers. There is no question that before the bridge existed, this is exactly what Adams Outdoor did. The income from using the west-facing billboard permit was $8,000

12

per month or $96,000 per year. Adams Outdoor asserts this use of the west-facing billboard permit no longer exists. Advertisers will not want to rent the west-facing billboard, rendering its corresponding permit useless.

¶69 The City argues that the property retains beneficial use because Adams Outdoor can still profitably use its east-facing sign, and the law, according to the City, will not divide property into separate segments. The City's argument fails because the law recognizes each permit as a distinct, standalone unit of real property. The west-facing billboard permit is not a "piece" of the pie. It is the whole pie.

¶70 This case is more akin to Maxey v. Redevelopment Authority, 94 Wis. 2d 375, 288 N.W.2d 794 (1980), than the cases the City cites involving single, contiguous plots of land. Maxey involved a redevelopment project that "placed a moratorium on the issuance of theater licenses in the central business section of [the city]" where Maxey operated a theater as a long-term leaseholder in the Baker Block Building. Id. at 385. As a result, Maxey could not renew his theater license, thereby "eliminat[ing] the economic value of the theater" and "substantially depriv[ing] [Maxey] of his economic interest in the property." Id. at 391. The Maxey court held that "where rental income was Maxey's only significant interest in the property, all, or substantially all, of the beneficial use of his property was taken from him." Id. at 392. So too here.

¶71 Adams Outdoor's property interest resembles the property interest in Maxey, not the single, contiguous piece of

13

real property in <u>Randall</u> and <u>Zealy</u>. <u>Maxey</u> involved property with distinct and separate units: the lessor's interest as the owner of the building, and Maxey's interest as the owner of both a 99-year lease and an annually-renewable theatre license from the City. <u>Id.</u> at 384, 391, 400-01. The <u>Maxey</u> court used the theatre license as the denominator, correctly deciding that without the license to operate the theatre, the lease was worthless. <u>Id.</u> at 391. The building had been constructed to be a theater, and that was its existing use. <u>Id.</u> The City's denial of the license constituted a taking because it deprived Maxey of all economic use of the property. <u>Id.</u> at 391-92.

¶72 The same is true for Adams Outdoor. It owns the west-facing billboard permit, whose sole economic benefit derives from renting the west-facing billboard to advertisers. The bridge deprives Adams Outdoor of economic use of the west-facing billboard permit, defeating Adams Outdoor's investment-backed expectations developed over years of consistent, unhindered use. The west-facing billboard permit is rendered useless as a result of the City's constructive taking of the west-facing billboard permit and the consequent deprivation of rental income. The City's action is a compensable taking. <u>Id.</u> at 392 (citing <u>Luber v. Milwaukee Cty.</u>, 47 Wis. 2d 271, 278, 177 N.W.2d 380 (1970)).

C

¶73 Takings law, properly applied, prevents unfair burdens from being imposed on a single property owner for a government project that will benefit the public as a whole. <u>Murr</u>, 137 S. Ct. at 1943.

14

In adjudicating regulatory takings cases a proper balancing of these principles requires a careful inquiry informed by the specifics of the case. In all instances, the analysis must be driven "by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice should be borne by the public as a whole.'"

Id. (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617-18 (2001)). It is undisputed that the bridge over the Beltline Highway benefits the public as a whole. But, this public benefit forced Adams Outdoor to bear a heavy burden——the destruction of all economically viable use of its property. Moreover, Adams Outdoor cannot take any steps to mitigate its losses because its legal but non-conforming use status precludes Adams Outdoor from reconfiguring or moving the structure in order to restore the rentability of the west-facing billboard. The bridge completely deprived Adams Outdoor of the only economically viable use (and therefore the entire value) of its west-facing billboard permit. As the owner of real property whose value the City wholly eliminated, Adams Outdoor is entitled to fair and just compensation.

\* \* \*

¶74 A lawful mechanism exists for invading the "sacred and inviolable rights of private property" as Blackstone outlined centuries ago:

So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community . . . . In vain may it be urged, that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man . . . to be the judge of this common good . . . . In this . . . the legislature alone

15

> can . . . interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price.

1 William Blackstone, Commentaries on the Laws of England 78-80 (George Chase ed., 4th ed. 1938) (1765). The City of Madison's construction of the bridge effected a compensable taking of Adams Outdoor's permit for the west-facing billboard because the City eliminated the only economically viable use of that permit.[5] While the City possessed the power to do this, it may not impose the economic burden of the public bridge on one property owner. I would reverse and remand for a determination as to the proper compensation owed for this constructive taking.

¶75 The majority permits the unconstitutional taking of private property without just compensation, thereby threatening

---

[5] I acknowledge that the City maintains it conceded that the bridge completely obscured the west-facing billboard only for purposes of this appeal. The City asserts that if this court determines a taking occurred, the "completely obscured" stipulation no longer applies and the circuit court would need to find what percentage of the west-facing billboard has actually been obscured.

16

the freedom of all private property owners in Wisconsin. I respectfully dissent.[6]

---

[6] The majority objects to addressing the permit as the denominator because this argument was raised in the amicus curiae brief, the permit is not in the record, the City's attorney believes there is not a separate permit for each side of the billboard, and forfeiture should apply. See majority op., ¶24 n.8. Amicus curiae, or "friend of the court" briefs, may be filed only with permission of this court. See Wis. Stat. § 809.19(7). An effective amicus brief "'bring[s] something new and interesting to the case.' This might be better research, more cogent analysis or a more convincing demonstration of the impact of the decision on the public at large." Randy S. Parlee, A Primer on Amicus Curiae Briefs, 62 Wis. Law. 15 (Nov. 1989) (quoted source omitted). The amicus brief did just that in this case. The amicus argument that the permit was the real property at issue dominated the first half of the oral argument, generating multiple questions and discussion on the topic——from three justices. The majority quotes an excerpt from oral argument making it appear that Adams Outdoor's lawyer forfeited the issue. But the excerpt does not give the whole story. The majority omits the clarification Adams Outdoor's lawyer made immediately after answering "Not, that's correct, Your Honor, not specifically":

> Chief Justice: So, you're not claiming that the income you earn by based on the permit, you're not claiming that's a concern for us, right?
>
> Adams Outdoor's lawyer: That is a concern, your Honor——
>
> Chief Justice: Alright, that's different than your answer to Justice [A.W.] Bradley's question.
>
> Adams Outdoor's lawyer: Maybe I misunderstood the question. Certainly, in terms of measuring the damages or impact or the value of that interest, whether you identify the value as flowing from the permit in the display of that sign or you just recognize that sign exists . . . And it will generate a certain amount of revenue through the display of advertising. That number, tied to the permit or tied to the sign face will be the same issue.

(continued)

17

¶76 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice DANIEL KELLY join this dissent.

---

In fact, Adams Outdoor's lawyer told the court at oral argument: "The permit to display the billboard is certainly a separate property interest that could be the subject of takings analysis in this case. I don't disagree with the amicus brief in that respect." And, he represented: "In fact, the city treats both sign faces as separate economic units by virtue of the fact that they have licensed both sign faces separately. And that's a critical piece of our analysis here. Certainly that license could stand for its own separate property interest that could be the subject of takings analysis." He asserted "I think we do have a property interest in the permit . . . ."

The City's attorney did not speak as definitively in responding that he merely believes Adams Outdoor's lawyer is wrong about the City issuing a separate permit for both the east- and west-facing billboards. Both the amicus lawyers and the lawyer representing Adams Outdoor unequivocally represented that the City issued two permits. Indeed, applicable law requires it. Far from being an "unsubstantiated factual allegation" as the majority characterizes it, majority op., ¶24 n.8, the existence of two permits is required by the City's own ordinance, Madison, Wis., Gen. Ordinance § 31.041(3) (2015).

As for forfeiture, it "is a rule of judicial administration, and as such, a reviewing court has the inherent authority to disregard a [forfeiture] and address the merits of an unpreserved issue in exceptional cases." Village of Trempealeau v. Mikrut, 2004 WI 79, ¶17, 273 Wis. 2d 76, 681 N.W.2d 190. "[C]ourts have authority to ignore the [forfeiture]." State v. Erickson, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999); see also Wis. Stat. § 751.06 (allowing discretionary review of issue not raised in circuit court). This court should not ignore a dispositive issue of law.